**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Jimmy JOINER, Defendant-Appellant.**

No. 28849.

United States Court of Appeals,
Fifth Circuit.

Aug. 10, 1970.

Rehearing Denied Oct. 2, 1970.

Clifford Brown, Brown & Harding, Lubbock, Tex., for defendant-appellant.

Frank D. McCown, Tim Timmins, Asst. U. S. Attys., Dallas, Tex., Eldon B. Mahon, U. S. Atty., W. E. Smith, Asst. U. S. Atty., Fort Worth, Tex., for plaintiff-appellee.

Before BELL, COLEMAN and AINSWORTH, Circuit Judges.

COLEMAN, Circuit Judge:

On June 3, 1969, the grand jury for the Northern District of Texas, at Lubbock, charged this appellant, Jimmy Joiner, with having unlawfully, knowingly, and feloniously aided and abetted the President of the Lorenzo State Bank in the misapplication of $82,676.67 of the funds of that bank. That part of the indictment [Count 3] which resulted in a conviction read as follows:

"COUNT 3

"On or about December 14, 1967, in the Lubbock Division of the Northern District of Texas, the defendant, A. W. LOTT, being an officer and employee, that is President of the Lorenzo State Bank, Lorenzo, Texas, (hereinafter called bank), the deposits of which bank were insured by the Federal Deposit Insurance Corporation, with the intent to injure and defraud said bank, did wilfully misapply the sum of $82,676.67 of the monies, funds and credits of the bank, and entrusted to its care and custody, in that the said A. W. LOTT, by reason of his possession and by virtue of the power, control, and authority he had over the monies, funds and credits of the bank as such officer, did divert the proceeds of a check drawn in favor of the bank by Johnny Vineyard in the amount of $51,436.67, and a note executed by Johnny Vineyard in favor of said bank in the amount of $31,240.00, and did cause the aggregate of such check and note to be paid in exchange for a certain item in the amount of $82,676.67, such item being dated November 30, 1967, drawn in the name of Jimmy Joiner, on an account styled

'Jimmy Joiner,' and the aforesaid account styled 'Jimmy Joiner' did not then contain sufficient funds to cover said item as the defendant A. W. LOTT well knew, whereby possession, control, and use of the said sum of $82,676.67 of the monies, funds and credits of the bank were depleted and lost to the bank and were then converted and misapplied to the use and benefit of A. W. LOTT and Jimmy Joiner.

"*At the time aforesaid, JIMMY JOINER unlawfully, knowingly and feloniously aided, abetted, counselled, commanded, induced and procured the commission of the offense above set out.* [Emphasis by this Court].

"In violation of Title 18, United States Code, Sections 656 and 2."

On October 10, 1969, a jury convicted Mr. Joiner of this Count, while acquitting him of two others. The defendant was sentenced to imprisonment for a period of two years and to pay a fine of $5,000. We affirm the judgment of the District Court.

■ It is contended on appeal that the evidence is insufficient to support the conviction and that the Court erroneously refused certain instructions requested by the defense.

It must be conceded at the outset that on the issue of knowingly counselling, aiding, and abetting another in the commission of a crime this case is a very close one on the facts. The facts are exceedingly tangled and hard to unravel.

In March, 1967, A. W. LOTT, President of the Lorenzo State Bank, obtained a personal loan of $80,000 from the Citizens National Bank of Lubbock. He deposited these funds in his personal account at Lorenzo. By two personal checks subsequently written he credited these funds to an account styled "J & J Joiner". This account had been opened some years previously by Jimmy Joiner and his father. Mr. and Mrs. Jimmy Joiner drew checks against the account for the full amount of the $80,000. On the face of it this was simply a personal loan from Lott to Jimmy Joiner and no funds of the Lorenzo State Bank were involved.

On July 17, 1967, Jimmy Joiner forged his father's name to a note to the Lorenzo State Bank for $30,000, which was deposited in the J & J Joiner account. This note was still held by the bank when it was temporarily closed on February 8, 1968. The elder Joiner learned of the note only after the bank had been closed. This $30,000 deposit was used to pay checks drawn by Jimmy Joiner, some of them dated as far back as February 15, 1967, of which $24,660.-78 had been held in the works of the bank, known as "cuts", items for which there had not been sufficient funds to pay.

It follows that on July 17, 1967, Jimmy Joiner owed A. W. Lott $80,000 and he owed the Lorenzo State Bank $30,000 on the note to which he had signed his father's name without authorization.

Apparently nothing else happened until October 11, 1967, when Mr. Lott wrote the President of Citizens National, authorizing that bank to charge the $80,000 note to the Lorenzo State Bank's correspondent account, which was done in the amount of $82,676.67, principal and interest. Lott's note was returned to him on November 1, 1967. The result was that the funds of the Lorenzo State Bank were depleted by $82,676.67, in payment of Lott's *personal* note.

Jimmy Joiner's name does not appear in this transaction until November 30, 1967, in a Lorenzo Bank credit ticket *in the same amount,* styled Citizens Lubbock, in the handwriting of A. W. Lott, bearing the notation, "Jimmy Joiner". The Lorenzo Bank records show that the $82,676.67 had not been paid from the J & J Joiner account.

Citizens National gave Lorenzo credit for the ticket. This balanced Lorenzo's books with Citizens and extinguished, so far as the books were concerned, the debit previously entered for the payment of Lott's personal note from Lorenzo bank funds.

Haney Bruce, former Cashier of the Lorenzo State Bank, testified that he saw the credit ticket and posted it on the general ledger for November 30, 1967. To him it indicated that the money was provided by Joiner for the payment of a loan participation held by Citizens National. Bruce further testified that on November 30, 1967, he saw a check in the "cuts" on Jimmy Joiner's account for "eighty something thousand dollars". This check was held in the "cuts", and unpaid, because the Joiner account was overdrawn. Bruce could not say that the check bore the genuine signature of Jimmy Joiner. The check was never charged to the account of Jimmy Joiner. It was later taken by Mr. Lott, and never seen again.

This check was replaced, in the "cuts", on December 14 by a note signed by Johnny Vineyard and by a check drawn by him on another bank. More of this later.

On the same day, Mr. Vineyard had written a check on the Lorenzo State Bank to the Insurance Company of North America for the amount of his note and the transferred funds. Unknown to him, none of the money had been deposited to his account, so that check was returned unpaid. About January 28 or 29, the check came to the Lorenzo Bank for the second time around and was paid. That payment, however, was balanced by another note signed by Mr. Vineyard for $85,176.67 on January 29, 1968, which will be discussed later. As previously stated, the bank was temporarily closed on February 8.

In 1967, Johnny Vineyard was in the business of writing insurance against crop damage by hail. He was thirty-seven years of age, had been in the insurance business for eleven years, and was a college graduate in agronomy. He represented the Insurance Company of North America and wrote policies on open account with his insurer, for which payment was due annually on the 15th of December, with a thirty day grace period. Some farmers paid cash for their policies but most gave their unsecured personal notes for the premium. On November 16, 1967, the company billed Vineyard for $108,281.82, premiums due as of December 15. Because all the farmer notes had not been collected Vineyard lacked about thirty thousand dollars having enough funds to pay the full amount due. He did not wish to use the grace period for the payment because he hoped that North America would handle his business for the next year.

Mr. Vineyard had known Jimmy Joiner for about three years. He knew Joiner well enough that on November 28 and December 1 he had loaned him $2,500 to assist in certain real estate transactions to which Joiner was a party. Vineyard was worried about where he could raise the $30,000 needed to meet his payment to North America. The usual practice was that lending institutions would advance eighty per cent on the premium notes, but a bank in Lubbock with which Vineyard usually did business declined to make such advances. Vineyard said this was due to a former partner of his, without detailing the reasons.

In any event, about December 10, 1967, Vineyard was drinking coffee with Joiner at a coffee shop in Lubbock and told him of his need for the funds to meet the payment due about five days later. Joiner told Vineyard that Mr. A. W. Lott of the Lorenzo State Bank might lend him the money against the former notes. Vineyard did not know Lott and had never done business with the Lorenzo State Bank.

The result of the conversation was that Vineyard and Joiner met in Lorenzo and went to see Mr. Lott. Lott told him to make a list of the crop hail notes, present the list, and "I think I can make you a loan".

Vineyard made the list and, again accompanied by Joiner, returned on the fourteenth, with hail notes amounting to about $39,000. He did not remember whether he endorsed them but, in any event, they were turned over to Lott. Lott agreed to lend $31,240, for which Vineyard executed his note, payable on

demand. Amazing as it may be, Vineyard received no deposit slip for this money. He asked about executing a signature card, but Lott said that such would have to clear through the IBM machine in Lubbock and it was not needed since he had Vineyard's signature on the note.

Vineyard asked to transfer the $31,240 to another bank to be consolidated with funds already on deposit there. Lott asked, "How do I know it's going to the Insurance Company of North America?". Vineyard responded, "Well, I can make the check out payable to them here". Lott said, "Why don't you transfer some of your other monies over here?" So Vineyard did, to the tune of $51,436.67. He left the bank without a deposit slip for the proceeds of either the note or the transferred funds. This, of course, amounted to just about the amount of the Citizens National transaction already described. In the presence of Lott and Jimmy Joiner, Vineyard wrote out a check for $85,176.67 to the Insurance Company of North America, took it with him when he left, and mailed it, with other funds, to the company. As already stated this check was not paid the first time it was presented through banking channels to the Lorenzo State Bank. Joiner did not actively participate in the transaction but it was called to Lott's attention that Joiner owed Vineyard $2,500. Joiner wrote a check for that amount to Vineyard, which was turned over to Lott. Vineyard supposed that Lott was lending Joiner enough money to cover this check. Vineyard left, while Joiner remained with Lott.

As previously indicated, Lott used Vineyard's note and the transferred funds to cover the credit ticket to Citizens National, bearing Jimmy Joiner's name, a notation in the handwriting of Lott. It was at this point that the "eighty some thousand" dollar Joiner check (on which the authenticity of Joiner's signature was not established) was taken from the "cuts" by Lott and thereafter disappeared. *This is the transaction involved in the indictment.*

About January 1 the Insurance Company of North America informed Vineyard that his $85,000 check drawn on the Lorenzo State Bank had been returned "drawn against uncollected funds".

As to this Vineyard testified as follows:

"Q. Did you contact Mr. A. W. Lott about this?

"A. That day, immediately after Insurance Company of North America contacted me, I called Mr. Lott and he said this $51,000 deposit I had made had been returned against uncollected funds, but it had cleared the bank, and for me to tell the Insurance Company of North America to send this check on through, that it would clear, and I did immediately".

There is nothing in the record to indicate that Jimmy Joiner's check for $2,500 was ever charged to his account, or paid, or the reasons for the failure.

On January 13, Vineyard paid $26,500 on his $31,240 note, leaving a balance due of $4,740.

Vineyard then began to receive messages from Lott, through Joiner, that he needed to pay the $4,700 balance.

The upshot of this was that Vineyard met Joiner in his office in Lubbock on January 29 and the two of them made another pilgrimage to Mr. Lott. Lott said nothing about the $4,700 balance but asked Vineyard to give him a note, as an accommodation for about two weeks, for "eighty some odd thousand dollars". Vineyard testified that he did not know why he did it, but he signed a note in the sum of $85,167.67, for which he received nothing in return.

Vineyard told Lott that he could not make a financial statement that would justify such a loan but Lott said he could take care of that. Vineyard signed the financial statement in blank. It was later found that this statement was false in some particulars, such as stating that Vineyard owned 10,240 acres of land in New Mexico.

Joiner seems not to have participated in this transaction other than to make suggestions about the financial statement, particularly as to Vineyard's ownership of an interest in a cotton topper, which was worthless, although it appeared on the financial statement as worth $200,000.

This $85,167.67 Vineyard note was used to cover the original Vineyard check to North America, the second time it was presented to the Lorenzo State Bank. A week later the Federal Deposit Insurance Corporation took over the bank in liquidation, due, the record shows, not only to this transaction but to many others as well.

Joiner offered five witnesses to his good general reputation in the community for veracity and honesty. It was said that he had been a good student in his younger days and evil had not been heard of him.

The question then is: Was this evidence, viewed in its entirety and not in compartments, and viewed also in the light most favorable to prosecution, sufficient to support the conviction?

We look first to the law.

The indictment charged that Joiner unlawfully, knowingly and feloniously aided and abetted Lott in the misapplication of the proceeds of Vineyard's note and check of December 14, 1967, to the repayment of the $82,676.67 which Lott had misappropriated from the Lorenzo State Bank on November 30, 1967, to cover payment of his personal debt to Citizens National Bank of Lubbock— money which had originally been loaned to Jimmy Joiner in March, 1967.

There is no argument about the misapplication or that Lott committed it. That Joiner associated with Lott was not, standing alone, enough to convict.[1] Mere presence at the scene of the crime, with nothing more, is not evidence that one is an aider or an abettor.[2] To sustain this conviction, the evidence, and the inferences reasonably to be drawn therefrom, had to be such as reasonably to generate a belief beyond a reasonable doubt that Joiner knew that the bank funds were being, or would be, misapplied, that he associated himself with the act, that he participated in it with a desire that it be accomplished, and that he committed some overt act designed to make it a success.[3] Joiner had to share the criminal intent or purpose of Lott and he had to assist him in the accomplishment of that purpose.[4]

This must be judged in the light of what happened on or before December 14, 1967, the date of the misapplication, although the occurrence of January 29, 1968, not charged in the indictment, was competent to show the intent with which Lott and Joiner may have acted on the prior date.

1. Ramirez v. United States, 9 Cir., 1966, 363 F.2d 33; Baker v. United States, 8 Cir., 1968, 395 F.2d 368.

2. United States v. Williams, 1951, 341 U.S. 58, 71 S.Ct. 595, 95 L.Ed. 747; United States v. Carengella, 7 Cir., 1952, 198 F.2d 3, cert. denied 344 U.S. 881, 73 S.Ct. 179, 97 L.Ed. 682; United States v. Minieri, 2 Cir., 1962, 303 F.2d 550, cert. denied 371 U.S. 847, 83 S.Ct. 79, 9 L.Ed. 2d 81; Newsom v. United States, 5 Cir., 1964, 335 F.2d 237; Baker v. United States, 8 Cir., 1968, 395 F.2d 368; United States v. Milby, 6 Cir., 1968, 400 F.2d 702.

3. Nye & Nissen v. United States, 1947, 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919; Hall v. United States, 5 Cir., 1960, 286 F.2d 676; Jasso v. United States, 5 Cir., 1961, 290 F.2d 671; White v. United States, 10 Cir., 1966, 366 F.2d 474; Peterson v. United States, 8 Cir., 1968, 405 F.2d 102, cert. denied 395 U.S. 938, 89 S.Ct. 2003, 23 L.Ed.2d 453; United States v. Manna, 2 Cir., 1965, 353 F.2d 191, cert. denied 384 U.S. 975, 86 S.Ct. 1868, 16 L.Ed.2d 685; Moore v. United States, 5 Cir., 1966, 356 F.2d 39.

4. King v. United States, 10 Cir., 1968, 402 F.2d 289; United States v. Varelli, 7 Cir., 1969, 407 F.2d 735. See our fairly recent decision in Grimes v. United States, 5 Cir., 1967, 379 F.2d 791, cert. denied 389 U.S. 846, 88 S.Ct. 104, 19 L.Ed.2d 113, in which it was held that receipt of a telephone call of unknown content from a known violator was insufficient to sustain a conviction for aiding and abetting.

The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the government, to support it. The government must have the benefit of all reasonable inferences which may be drawn from the proven facts, Moody v. United States, 5 Cir., 1967, 377 F.2d 175. We are a court of review and not a trial court or jury. We do not find facts and we do not resolve issues of credibility. We review the evidence in keeping with these standards.

First, in the light most favorable to the verdict:

All through the year 1967 Jimmy Joiner had been in the most pressing and and painful financial difficulties. That he would violate the law in an effort to extricate himself, if only temporarily, is evidenced by the forgery which he committed in July in the amount of $30,000. He owed A. W. Lott $80,000, which he knew had not been repaid. He was present in the Lorenzo State Bank on December 14 and saw that Vineyard failed to receive a deposit slip for approximately $85,000 which had just been placed in the hands of Lott. He wrote out a check for $2,500 to Vineyard in repayment of a loan. That check was apparently never paid or charged to his account. After Vineyard left the bank on December 14 Joiner stayed on with Lott. In January Joiner went with Vineyard to see Lott and witnessed the signing of the accommodation note for $85,167.67. He suggested to Vineyard that he list a worthless asset as being an extremely valuable one.

On the other side of the picture there is no evidence in this record to explain why Lott loaned Joiner the $80,000, there is no evidence to show that Lott had ever asked Joiner to repay the money, there is no direct evidence to show that Joiner ever knew that Lott had used funds of the Lorenzo State Bank to repay Lott's personal loan to Citizens National of Lubbock, there is no direct evidence to show that Joiner knew of the credit ticket dated November 30, which had his name on it in the handwriting of Lott, and there is no evidence to show that Joiner actually signed or knew of the $80,000 Joiner check which disappeared before December 14. There is no direct evidence to show that Joiner was personally present or knew what Lott did with Vineyard's money. He saw Vineyard make out a check to the Insurance Company of North America for the full amount of the money. He knew the check was due in Dallas the next day and, in due course, would have to be paid. The evidence affirmatively shows that on December 14 Joiner took no part in the conversation between Vineyard and Lott and made no suggestions as to how the transaction should be handled or consummated.

Even so, the jury, considering all the facts, was entitled to weigh the conflicting inferences and judge that which it would believe beyond a reasonable doubt. Joiner owed Lott over $80,000, which he knew he had not paid. He steered Vineyard to Lott. He saw that Vineyard's note and transferred funds amounted to the amount of his indebtedness. He witnessed Vineyard's failure to receive a deposit slip for the unusually large sum left in Lott's hands, with the result that Lott was left in a position to misapply the funds, if he so chose. Then, when the payment of Vineyard's checks had to be covered on the second time around, he went back with Vineyard and saw him sign a note for just enough to cover what should have been Vineyard's own funds. In effect, he helped persuade Vineyard to sign such a note by suggesting the listing of a false asset.

It cannot be said, therefore, that there was no evidentiary justification for the jury verdict that Mr. Joiner acted with knowledge and intent rather than from ignorance and innocence. Moreover, the record reveals that this jury appears to have been careful of its verdict; it acquitted Mr. Joiner of two other counts in the indictment.

Considering the instructions to the jury as a whole, we find that they suffi-

ciently stated the law of the case and the appellate attack in that regard must be rejected.

The judgment of the District Court is Affirmed.