UNITED STATES of America,
Plaintiff-Appellee,

v.

Phillip E. GUTMAN,
Defendant-Appellant.

No. 82–1844.

United States Court of Appeals,
Seventh Circuit.

Argued April 12, 1983.

Decided Jan. 10, 1984.

Rehearing and Rehearing En Banc Denied May 9, 1984.

As Amended May 10, 1984.

John Powers Crowley, Cotsirilos & Crowley, Ltd., Chicago, Ill., for defendant-appellant.

Richard L. Darst, Chief Deputy U.S. Atty., Indianapolis, Ind., for plaintiff-appellee.

Before POSNER and COFFEY, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

POSNER, Circuit Judge.

This appeal by Phillip Gutman, the former president pro tem of the Indiana Senate, from his conviction for using his official position to extort money in violation of the Hobbs Act, 18 U.S.C. § 1951, requires us to consider several of the district court's procedural rulings.

The case grows out of the efforts of the Indiana Railroad Association, an association of railroads operating in Indiana, to get Indiana's "full crew" law repealed. In 1972 the Indiana Senate passed a bill to this effect which became law. According to Howard Odom, the Association's executive director and a key government witness at Gutman's trial, in 1973 Senator Gutman had told him that the Association had not treated Senator Edwards, the sponsor of the bill, right, and that Odom should see another influential senator, Gardner, about making amends. Odom went to see Gardner, who told him that all three senators—Gutman, Edwards, and Gardner—had worked hard for the passage of the bill and expected something in return—to wit $1,000 a month for five years, to be split among the three senators. The implication was that the payments were a precondition to the senators' assisting the railroads to get favorable legislation in the future. The payments were made from 1973 to 1976 and formed the basis of the indictments of the three senators. (Gardner died before trial; Edwards pleaded guilty shortly after the beginning of the trial, in which he was a codefendant with Gutman.) Each $1,000 check was sent to Edwards, who then sent checks for $333 to Gutman and Gardner. Gutman deposited his checks in a personal account rather than in the account of his law partnership, although his defense at trial was that the money had been payment for legal services for the Association.

Odom had first manifested mental illness in 1944 while in the armed services. In January 1981, thirteen months before the start of the trial, and apparently as a result of the investigation which led to the indictments, he had been hospitalized for depression. One doctor reported at that time that "it was obvious [that Odom] is highly depressed and has some psychotic thought disorder, in addition to the difficulty he has in organizing and being relevant," another that Odom "displayed very definite paranoid ideas. . . ." One of the reports also states, however, "His thinking is clear in terms of historical events, but in regards to events in the past year he does not choose to speak openly about them. He does admit that he is in some type of difficulty." Odom was discharged in February 1981 but told to continue taking antipsychotic and antidepressant drugs. "The progress is guardedly favorable." But he was rehospitalized a month later after attempting to strangle his wife, and discharged a month after that with instructions to keep taking the medicine. During this hospitalization, a doctor reported that Odom "was able to give me a relatively complete and sensible history, although his manner appeared quite sour, mildly irritable and depressed throughout. . . . No significant evidence is seen of a major breakdown in reality testing, judgment of [or?] progress of thought, and his capacity for ordinary conventional thinking is unimpaired." But a doctor told Odom's lawyer: "it is my opinion you will have considerable difficulty in getting him to relate openly and satisfactorily in order to assist you in his own defense."

In December, two months before the trial was to begin, Gutman's counsel moved for an order that Odom be given a psychiatric examination before being permitted to testify. The district judge denied the motion,

along with Gutman's motion for a pretrial hearing on Odom's competence to testify. Gutman's appeal challenges both of these denials.

■ Although insanity as such is no longer a ground for disqualifying a witness, see Fed.R.Evid. 601, a district judge has the power, and in an appropriate case the duty, to hold a hearing to determine whether a witness should not be allowed to testify because insanity has made him incapable of testifying in a competent fashion. But as with most issues of trial procedure we shall not reverse the judge's determination unless we have a clear conviction that he erred. We do not have that conviction here. Even if we assume (a matter on which the record is unclear) that Gutman in moving for a competency hearing for Odom put before the judge all the psychiatric reports from which we have quoted, we do not think those reports created such serious doubt as to Odom's competency as to compel the judge to grant a hearing on the question. That Odom had had bouts of serious mental illness in the year before the trial was beyond question, but the judge was entitled to conclude that the reports taken as a whole did not suggest that Odom was incapable of telling the truth or of appreciating the significance of his oath as a witness. We are reluctant to open the doors to sanity hearings for witnesses.

There is also no question that the district judge could have conditioned Odom's testifying on his agreeing to take a psychiatric examination the results of which would be available to Gutman's lawyer for use in impeaching Odom on the stand. The rule allowing the insane to testify assumes that jurors are capable of evaluating a witness's testimony in light of the fact that he is insane, cf. Advisory Committee's Note to Rule 601; and it may seem to follow that the jury, to assist it in evaluating such testimony, should have the results of an up-to-date psychiatric examination of a prospective witness who has given definite indications of serious mental illness, as Odom had. The courts that have addressed the question agree, however, that the power not

to allow a witness to testify unless he submits to a psychiatric examination should be exercised sparingly. See, e.g., *United States v. Raineri,* 670 F.2d 702, 709 (7th Cir.1982); *United States v. Roach,* 590 F.2d 181, 185–86 and n. 9 (5th Cir.1979); *United States v. Heinlein,* 490 F.2d 725, 730–31 (D.C.Cir.1973). It is unpleasant enough to have to testify in a public trial subject to cross-examination without also being asked to submit to a psychiatric examination the results of which will be spread on the record in open court to disqualify you, or at least to spice up your cross-examination. And while Howard Odom's privacy may already have been hopelessly compromised by the government's having turned over to the defense (pursuant to Odom's guilty-plea agreement) seven psychiatric reports on him, with no restrictions placed on their use in cross-examination or in arguing to the jury, this also meant that the defense had plenty of psychiatric ammunition to use against Odom, and hence that Odom's mental condition was not concealed from the jury. As a matter of fact, the reports were read *in toto* to the jury, which thus knew that Odom had a history of serious mental illness and that his latest hospitalization had occurred under bizarre circumstances nine months before the trial. And that a mentally ill person may give testimony that is false (though he may believe it to be true) is a possibility that a jury should be capable of understanding and making appropriate allowances for. Gutman argues, moreover, that Odom's testimony was "incoherent." If so, the jury would have discounted it. If a lunatic takes the stand and babbles gibberish, the jury will ignore it and the defendant will not be harmed. Finally, the parts of Odom's evidence that Gutman points to as showing his incoherence could not have hurt Gutman, as when Odom said, "I have been lying about this thing and I want to tell the truth," or when he said, "The first part of the Grand Jury report I lied about," and then a few questions later said, "I don't think I lied to the Grand Jury, now that I think about it."

Gutman also argues that the district judge should have instructed the jury to disregard Odom's testimony, because the testimony, whether because of Odom's mental illness or some other cause, was so internally inconsistent—so "incoherent" in a logical sense—that it was entitled to no weight. We have read the transcript of Odom's testimony and do not find in it any abnormal degree of internal inconsistency, bearing in mind that Odom was in the uncomfortable position of testifying to illegal conduct to which he had been a party. In regard to the initial meeting with the three senators and to the monthly payments on which the charge of extortion was based, Odom's story was consistent, though he testified that he did not regard the payments as extortion. Odom also testified about a $40,000 payment to Gutman, a payment which was not charged as extortion but about which the government was allowed to present evidence anyway (whether this "other crimes" testimony was proper is considered next). His testimony about this payment contained a significant inconsistency: he repudiated the story he had given the FBI regarding one of the two conversations he had had about Gutman concerning the payment. But of course it is common for witnesses to change their stories on the stand; if that were enough to disqualify a witness there would not be many successful prosecutions. Impeachment of a witness does not compel exclusion of his testimony.

The $40,000 check that Gutman received from the Association he again deposited in a personal account and did not report as partnership income, and according to a railroad president's testimony the payment was a bribe or payoff for other assistance rendered by Gutman to the railroads. Gutman points out that the indictment did not charge him with receiving any $40,000 bribe or payoff and argues that the introduction of such evidence of another crime was improper and extremely prejudicial. Prejudicial it was; the amount was greater than Gutman had received from the extortion for which he was tried. But it also was material. Gutman did not deny receiving $333 a month from the Association through Edwards. His explanation was that this was a retainer for representing the Association in various matters. The fact that he received $40,000 from the Association in circumstances powerfully indicating that it was a bribe or payoff (Gutman claimed that the payment was for legal services rendered in connection with a drainage problem, but he had not been retained by any of the parties concerned with the problem) tended to discredit his explanation of the monthly payments that he was charged with having extorted, and was therefore relevant to the specific extortion charge against him. It also connected him to the Association, which was important because he had not received the monthly checks directly from the Association, but through Edwards. Relevant evidence of other crimes is admissible provided that it is clear and convincing (so that the government is not tempted to introduce evidence of crimes of which the defendant may well be innocent) and that its probative value outweighs its prejudicial impact. *United States v. Dolliole,* 597 F.2d 102, 106–07 (7th Cir.1979). Rule 403 of the Federal Rules of Evidence commits the balancing judgment to the discretion of the district judge, who is in a better position than we appellate judges to assess the impact of testimony on a jury and whose determination can therefore be upset only if he has made a clear error, 597 F.2d at 107, which we do not think the district judge made in this case.

The last issue is whether the district judge should have held a hearing to explore Gutman's charge that the jury was prejudiced against him. This charge is based on several incidents, none very significant in itself. The first is that Gutman's codefendant, Edwards, disappeared from the dock shortly after the jury was impaneled, because he had pleaded guilty; and though the jury was not told the reason for his disappearance—was told only that it should not speculate on the reason—several jurors learned from radio or television news reports or newspaper headlines that Edwards had pleaded guilty. The district judge asked the jurors whether they could con-

sider Gutman's case independently of Edwards'. Two said they could not and were excused. A third later told the judge that he had made up his mind and he was excused too. Alternates replaced the excused jurors. After the trial was over Gutman submitted affidavits of several jurors which indicated—what was anyway clear from the inquiry about Edwards' plea— that they had heard or read about the trial in the media.

The fact that jurors, several or all, knew that Gutman's codefendant had pleaded guilty was not a ground for a mistrial, as we have held many times. E.g., *United States v. Aldridge*, 484 F.2d 655, 659 (7th Cir.1973). When a codefendant drops out in the course of trial, a juror would have to be pretty stupid not to surmise that he had pleaded guilty; and if this knowledge were grounds for mistrial it would be impossible for a defendant in a multiple-defendant case to plead guilty after trial began. The fact that three jurors were excused, two because knowledge of Edwards' plea had made it impossible for them to judge Gutman impartially, was no ground for a mistrial either. That several jurors were willing to come forward and state to the judge that they could not decide the case impartially shows only that the judge had succeeded in creating an atmosphere in which jurors were unafraid to voice in open court doubts about their own impartiality.

 A typical affidavit was that one juror had heard on the radio "comments in regard to progress of the trial." Any juror with eyes and ears is likely to hear some media comments on a trial of a prominent person. The best he can do is to tune out as quickly as possible, which so far as appears is what the jurors did. If Gutman was concerned that the jury would be "contaminated," as his brief puts it, by media reports on the trial, he should have moved to sequester the jury, and he did not.

 The practice of getting affidavits from jurors to impeach their verdict, though no longer considered improper when the affidavit is not about the juror's thinking process in arriving at the verdict but about extraneous factors such as media coverage that may have infected that process, must not be encouraged. The prac-

tice is inherently intimidating, cf. *Miller v. United States*, 403 F.2d 77 (2d Cir.1968) (Friendly, J.), and if it ever becomes widespread will make it even more difficult than it already is to get competent people to serve on juries. No adequate showing of need to engage in such solicitation was made here and the district judge was therefore not required to consider the affidavits, which in any event did not show that the jury was prejudiced.

Finding no reversible error we

Affirm.

COFFEY, Circuit Judge, dissenting.

The majority in the present action has decided to affirm the defendant Gutman's conviction. In so doing, they have upheld the district court's denial of Gutman's motions: (1) for a pretrial hearing to determine the competency of Howard Odom, a key government witness; (2) for an order requiring that Odom undergo a psychiatric examination before being allowed to testify; and (3) for an order striking Odom's testimony. Because I conclude, after a thorough review of the record, that the district court erred in denying these three motions, I respectfully dissent.

I.

An examination of the record reveals that the defendant's motions and arguments concerning Odom's questionable ability to testify truthfully and coherently have substantial merit. Odom's history of psychiatric problems dates back to 1944 when he received a medical discharge from the United States Army for "psychoneurosis." On January 16, 1981, only 13 months prior to trial in the present case, he was hospitalized for psychiatric treatment to rectify his then depressed mental state. One of the attending doctors observed during this hospital stay that: *"the patient is highly depressed and has some psychotic thought disorder in addition to the difficulty he has in organizing and being relevant. His nihilistic and paranoid ideas are expressed with little apparent insight."* Another doctor also noted Odom's *"definite paranoid ideas."* On February

12, 1981, he was released with a "guardedly favorable" prognosis provided he continued to take his medication as prescribed.

He failed to do so, however, and was re-committed pursuant to an emergency court order on March 13, 1981, some 11 months prior to trial, when he apparently attempted to strangle his wife. During this attempted violent assault, he remarked that he had to do it. This hospital stay lasted until April 10, 1981. On May 29, 1981, approximately nine months before trial, Odom's attorney (Odom at that time was a defendant in the present action) received a letter from Odom's psychiatrist explaining that:

> "Mr. Odom has a very long-standing personality pattern best described as chronic anxiety defended against by obsessive—compulsive mechanisms. These, in general, have kept him from serious decompensation until the recent stress factors in his life [those being his implication in the present action]. Certainly, in January of 1981 he did decompensate into a psychotic depressed state. Since then, he has been in contact with reality, but his adjustment still leaves much to be desired. He continues to have great difficulty in facing his present situation in a straightforward and effective manner. He is prone to postpone or to try and evade coming to grips with his external problems. *I feel certain that his recent request to appear before a grand jury has created sufficient increase in his stress that he has slipped back and withdrawn more into his previous mental state.*" (Emphasis added.)

In conclusion, the psychiatrist stated:

> "In view of the experience I have had with him over these past five months, it is my opinion that you will have considerable difficulty in getting him to relate openly and satisfactorily in order to assist you in his own defense."

Some two months prior to trial, Gutman filed a motion requesting that a hearing be held regarding Odom's competency to testify, that Odom be ordered to undergo a psychiatric examination and that Odom's medical records be released. Both Odom and the Government opposed these motions which ultimately were denied by the trial court.

Three days before the trial was to commence, Odom entered into a plea agreement wherein he agreed to plead guilty to one count of the indictment and to testify, if subpoenaed, on behalf of the government. In return, the government agreed not to make any sentencing recommendation. At the final pretrial conference, held on the same day the plea agreement was executed, Gutman renewed his motions for a competency hearing and a psychiatric examination of Odom. It was not until this point in the proceedings, the very eve of trial, that Odom waived his physician/patient privilege thereby permitting access to his medical records. Thus, the specific nature and severity of Odom's psychiatric problems were not revealed to Gutman or his attorneys prior to this release of the medical records. Both Odom and the government again opposed Gutman's motions which the trial court again denied. Odom was once again committed to a mental health facility by court order on May 13, 1982, just two months after the conclusion of Gutman's trial.

II.

A. Motion for a Competency Hearing.

With respect to Gutman's motion for a competency hearing, the majority states:

> "Although insanity as such is no longer a ground for disqualifying a witness, see Fed.R.Evid. 601, a district court judge has the power, and in an appropriate case the duty, to hold a hearing to determine whether a witness should not be allowed to testify because insanity has made him incapable of testifying in a competent fashion."

While I agree with their general statement of the law in this regard, I cannot agree with the majority's determination that the failure to hold a competency hearing was not error requiring reversal in the present case where a substantial doubt existed as to the competency of the government's key witness.

The competency of a witness and the admissibility of his testimony are preliminary questions entrusted to the discretion of the trial judge. Fed.R.Evid. 104(a). That discretion is not unlimited, however, and is subject to appellate review for abuse. But even if evidence is admitted in error, reversal is not automatically required. Fed. R.Evid. 103 provides:

"Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected...."

Thus, Gutman must not only demonstrate that the trial court abused its discretion, but he must also show that the erroneous admission of Odom's testimony affected his substantial rights. I believe he has met that burden.

With regard to the need for a competency hearing, it is my considered view that Rule 601 continues to place both the responsibility and the burden upon the trial judge to evaluate, in appropriate cases, the witness's mental capability to determine whether his testimony would be of benefit to the jury's deliberation in light of his questionable reliability. The issue is whether the witness is so unreliable and therefore untrustworthy that the admission of his testimony would be an abuse of discretion due to its potential to mislead and/or confuse the jury (under Fed.R.Evid. 403) and its corresponding lack of probative value (under Fed.R.Evid. 401).

As the Fourth Circuit stated in *United States v. Lightly*, 677 F.2d 1027 (4th Cir. 1982):

"Every witness is presumed competent to testify, Fed.R.Evid. 601, unless it can be shown that the witness does not have personal knowledge of the matters about which he is to testify, *that he does not*

*have the capacity to recall, or that he does not understand the duty to testify truthfully.*"

*Id.* at 1028 (emphasis added). Thus, if there is a substantial doubt concerning a witness's competency to testify, whether it be in regard to his capacity to recall, or his understanding of the obligation to tell the truth, the trial court not only has the power but, in addition, has the duty to rule the witness incompetent to testify. When such a doubt is raised the judge should at the very least order a hearing to determine whether that witness has the mental capacity to testify truthfully and accurately.[1] The majority does admit that the trial court has the obligation to hold a hearing to determine a witness's competency "in an appropriate case...." Majority opinion at 420.

My position regarding the need for a competency hearing in the case of a witness whose capacity is in serious doubt finds support in several treatises on evidence. For example, Professor Graham states:

"When Rule 601 is viewed in light of Rules 602, 603 and 403, it becomes manifest that in spite of any contrary implications in Rule 601, a witness must possess sufficient mental capacity to observe, record, recollect, and narrate as well as an ability to understand the duty to tell the truth, and that the court in its discretion may both *conduct a preliminary hearing and order a psychiatric examination in aid of its determination.* If the witness by reason of age, retardation, injury, or illness is so severely mentally deficient that a reasonable juror could not put any credence in the witness's testimony, i.e., the witness lacks minimum credibility, *the court must find that the witness is incompetent to testify.* Minimum credibility should be evaluated in *light of the need for the witness' testi-*

---

1. The capacity to understand the duty to tell the truth and the ability to recall continue to be relevant factors in determining the competency of a child to testify. *See United States v. Jones*, 482 F.2d 747 (D.C.Cir.1973); and *United States v. Perez*, 526 F.2d 859 (5th Cir.), *cert. denied*, 429 U.S. 846, 97 S.Ct. 129, 50 L.Ed.2d

118 (1976). If competency of a child remains a preliminary concern, *a fortiori* competency of a witness who is allegedly insane or mentally ill continues to be a necessary preliminary determination to the admissibility of that witness's testimony.

*mony as well as the factors listed in Rule 403."*

Graham, *Handbook of Federal Evidence,* § 601.2 at 377–78 (1981) (emphasis added, footnotes omitted). Weinstein is in accord.

"[S]ince there are no longer artificial grounds for disqualifying a witness as incompetent, the traditional preliminary examination into competency is no longer required. But a trial judge still has broad discretion to control the course of a trial (Rule 611) and rule on relevancy (Rules 401 and 403). If competency is defined as the minimum standard of credibility necessary to permit any reasonable man to put any credence in a witness's testimony, then a witness must be competent as to the matters he is expected to testify about; it is the court's obligation to insure that he meets that minimum standard. In making this determination the court will still be deciding competency. It would, however, in view of the way the rule is cast, probably be more accurate to say that the court will decide not competency but minimum credibility. This requirement of minimum credibility is just one aspect of the requirement of minimum probative force—i.e., relevancy. Regardless of terminology, the trial judge may exclude all or a part of the witness' testimony on the ground that no one could reasonably believe the witness could have observed, remembered, communicated or told the truth with respect to the event in question. He may use the voir dire to make this determination."

3 Weinstein and Berger, *Weinstein's Evidence* ¶ 601[01] at 601–(9–10) (1982) (footnotes omitted). *See also United States v. Banks,* 520 F.2d 627, 630 (7th Cir.1975).

**2.** As previously noted, in his May 29, 1981 letter, Odom's psychiatrist stated: "it is my opinion that you [Odom's attorney] will have considerable difficulty in getting him to relate openly and satisfactorily in order to assist you in his own defense." Clearly, if a witness cannot openly relate to his attorney on a particular matter, he cannot competently testify regarding that matter.

**3.** The majority raises the question of whether the court was aware of the psychiatric reports

In the case at hand, in view of Odom's severe psychiatric history, serious questions existed concerning: (1) his ability to accurately recall the matters about which he was summoned to testify, and (2) his capacity to accept and understand the duty to speak truthfully. As to the latter duty, it should be pointed out that Odom's psychiatric reports document his admission that he *"has been a liar and conning people for years."* Additionally, Odom's psychiatrist concluded that the increase in stress resulting from his appearance before the grand jury had been enough to trigger his most recent psychotic episode. Certainly Odom's psychiatric history coupled with his psychiatrist's evaluation that increases in stress could and did cause him to decompensate should have raised a reasonable doubt in the mind of the trial judge about Odom's ability to testify truthfully and accurately, particularly under the greater stress surrounding in-court direct and cross-examination testimony.[2] Thus, contrary to the cursory analysis of the majority wherein they deny any need of a competency hearing, there was a serious question concerning Odom's ability to truthfully testify which should have triggered an immediate and careful examination by the trial court.[3] This is especially true because Odom's testimony was crucial to the government's case.

In a key witness situation it becomes imperative that a competency hearing be held. As the court in *United States v. Crosby,* 462 F.2d 1201 (D.C.Cir.1972), stated:

"[O]nce a trial judge is confronted by any 'red flag' of *material* impact upon competency of a witness, an inquiry must be made into the facts and circumstances relevant thereto.

\* \* \* \* \* \*

prior to ruling on Gutman's motion for a competency hearing. The reports were, however, read to the jury verbatim immediately prior to Odom's testimony. Assuming the court did not know of their contents before this time, once it did become aware of the reports it was then required to hold a competency hearing due to the substantial question those reports raised with regard to Odom's ability to testify truthfully and accurately.

[T]he competency standard for witnesses may vary depending on the importance of the witness to the case. *Where, as here, the witness is the key witness for the prosecution, justice demands a strict standard of competency."*

*Id.* at 1203 (emphasis added). Reason and common sense dictate that as the importance of the witness increases, the need to ensure his reliability correspondingly increases. Thus, when Odom's tenuous grasp of reality is combined with the key nature of his testimony the need for a competency hearing to ensure the fairness of the defendant's trial becomes clearly apparent, as does the trial court's error in denying such a hearing.

The government argues that there was adequate and significant testimony other than Odom's, which implicated Gutman in the crimes charged.[4] Contrary to the government's contentions, however, it was *Odom's* testimony that provided the evidence directly linking Gutman to the money paid by the Indiana Railroad Association ("IRA"). In addition, Odom was the *only* witness to testify with regard to the alleged reason why that money was paid, i.e., to ensure the passage of legislation favorable to the Association. While the Government stresses other testimony such as Gutman's failure to report the money he admittedly received, it is inconceivable that this circumstantial evidence alone could establish each and every element of the crime of extortion necessary for a finding of guilt since only Odom's testimony provides the key link—abuse of official position to extort money from the IRA. Based on the essential nature of Odom's testimony, and the substantial doubts surrounding his reliability due to his psychiatric history, I conclude that a competency hearing was required

and that it was an abuse of discretion not to conduct such a hearing.

Finally, I merely note that contrary to the majority's view, my dissent does not "open the doors to sanity hearings for witnesses." Rather, it simply enunciates the law as it exists under the Federal Rules of Evidence. *See supra,* Graham, *Handbook of Federal Evidence,* § 601.2; and 3 Weinstein and Berger, *Weinstein's Evidence,* ¶ 601[01].

B. Motion for an Order of a Psychiatric Examination.

Closely related to the issue of whether the trial court erred in refusing to conduct a competency hearing is the question of whether the trial court erred in refusing to order Odom to undergo a psychiatric examination before allowing him to testify. A current psychiatric examination would obviously be extremely relevant evidence on the question of Odom's competency to testify. Such an examination would also be germane to the issue of his credibility.

In *United States v. Benn,* 476 F.2d 1127 (D.C.Cir.1972) the court was faced with defendants whose convictions turned on the testimony of an 18 year-old mentally retarded girl who had in the past both fantasized and been inconsistent in her memory.[5] With regard to the need for a psychiatric examination, the court stated:

"The dangers which must be considered in determining whether a mentally retarded rape prosecutrix is a competent witness must also be considered by the jury in assessing her credibility, particularly since 'the jury's estimate of the truthfulness and reliability of a given witness may well be determinative of

---

4. If this actually was the case then why did the government risk losing their conviction either at trial or on appeal by calling a person who they knew to be of very questionable reliability based on his documented history of mental instability? Note that the government had access to Odom's medical records before trial.

5. The fact that the witness in question in *Benn* was mentally retarded does not make *Benn* distinguishable from the present case. In both

*Benn* and the case at bar the key motivating factor for ordering a psychiatric examination would be to provide competent psychiatric evidence regarding the credibility and trustworthiness of the questioned witness to aid both the judge in making an intelligent judgment as to the witness's competency, and the jury in making its determination as to the witness's credibility.

guilt or innocence....' The jury may be aided in its task by the results of a psychiatric examination, even when such an examination is not necessary to the judge's determination of competency. When an examination should be ordered to aid the jury is also a judgment, involving a balancing of need against dangers, which is committed to the discretion of the trial judge."

*Id.* at 1131 (*quoting Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959)) (footnotes omitted). Thus, an examination would have provided the jury with extremely relevant evidence as to Odom's credibility.

The court in *Benn* ultimately determined that such an examination was not necessary because it found "strong indications of reliability of the prosecutrix's testimony ...." *Id.* Referring to these indications of reliability, the court stated:

> "In the present case the trial court found that the prosecutrix demonstrated an understanding of her duty to tell the truth and a capability to observe and remember. A comprehensible narrative does emerge from the sum of her testimony. Also, as the cautious trial judge noted before allowing the witness to testify, there was substantial corroboration to her testimony giving extrinsic assurance of its reliability. Finally, the judge had the benefit of the girl's father's testimony as to her retardation to assist him."

*Id.* No such "strong indications of reliability" can be found in the case at hand. The trial court made no finding regarding Odom's understanding of the duty to tell the truth or of his capacity to observe and remember, nor was there substantial corroboration of Odom's testimony. Additionally, a comprehensible narrative did *not* emerge. Thus, the reasons which weighed against an order of a psychiatric examination in *Benn* simply do not exist in the present case. On the contrary, there were unanswered doubts surrounding Odom's reliability which were ultimately borne out by his testimony.[6] *See, e.g.,* discussion of motion to strike, *infra.* Thus, the issues of Odom's competence and credibility heavily favored an order of a psychiatric examination, and unlike *Benn,* the trial court's denial cannot be justified by reference to any countervailing indications of reliability.

In the First Circuit's recent *United States v. Hyson,* 721 F.2d 856 (1st Cir.1983) decision, the court denied the defendant's first motion to have the questioned witness examined to determine whether he was under the influence of drugs. On the second day of his testimony, the court *sua sponte* requested the witness to be examined for drug use after he had difficulty speaking and had mentioned that he felt sick. The witness had to that point repeatedly denied drug use. Two days after the court's request, the examining doctor testified (outside the jury's presence) that, based on his examination, the witness had been under the influence of phencyclidine when he testified which had caused him to be in "an acute confusional state." The doctor went on to explain that this "state" would be expected to clear within 24 hours. Upon receiving this testimony, the court requested the doctor to re-examine the witness to determine his present competence to testify; the procedure we feel was absolutely necessary in the present case. The doctor, upon this re-examination, concluded that the witness's mental status was "much improved" over his confused state just two days prior. Relating *Hyson* to the case at bar, it should be noted that the fact *Hyson* involved drug intoxication does not make it inapposite since both insanity and drug intoxication directly affect the reliability of a witness's testimony. While Odom did not appear to have difficulty speaking, his testimony was confused, inconsistent and con-

---

**6.** Typically reviewing courts which have sustained trial court decisions to deny psychiatric examinations have justified their determination to a great extent on the fact that the questioned witness subsequently testified in a consistent and coherent manner and was substantially corroborated by other evidence. *See, e.g., United States v. Butler,* 481 F.2d 531 (D.C.Cir. 1973); and *United States v. Skillman,* 442 F.2d 542 (8th Cir.), *cert. denied,* 404 U.S. 833, 92 S.Ct. 82, 30 L.Ed.2d 63 (1971). Such is obviously not the case here.

tradictory which obviously more than justifies an order of an examination. If the trial court had required an examination as in *Hyson*, Gutman would have little to complain about since a qualified psychiatric determination would have been available as to both the question of competence and credibility.[7]

Based on the foregoing analysis, I find it hard to understand how the majority can conclude that a psychiatric examination was unnecessary. Mindful of our society's choice *to presume innocence until proven* otherwise, I place the question to the majority whether they believe they would receive a fair trial if, as criminal defendants, they faced an accusing witness who had Odom's history of mental illness and instability, and the trial court refused their request to obtain some meaningful type of psychiatric determination of that witness's grasp of reality *at the time of trial.* The question becomes whether under such circumstances we can truly say that the defendant has received a fair trial as required by the Fifth Amendment.

The majority recognizes that the trial court "could have conditioned Odom's testifying on his agreeing to take a psychiatric examination the results of which would be available to Gutman's lawyer for use in impeaching Odom on the stand." They conclude, however, "[t]he courts that have addressed the question agree ... that the power not to allow a witness to testify unless he submits to a psychiatric examination should be exercised sparingly." I agree that such power "should be exercised sparingly," but if the facts of this case do not compel the use of that power, then no case will ever provide circumstances justifying such an order. In my twenty-nine years on the bench, I have never observed a set of circumstances which more appropriately warrant the order of a psychiatric examination. This suit presents a witness having a history of severe psychiatric episodes. He had two breakdowns within thirteen months of trial; both requiring hospitalization, with the second hospitalization being pursuant to an emergency court order. The psychiatric evaluations of that witness state that the increased stress surrounding his appearance before the grand jury was enough to trigger a psychotic episode thereby raising a definite possibility that such an episode would be repeated during his testimony at trial. In addition, that witness's testimony at trial was confused and inconsistent.[8] Furthermore, his mental instability was so transparent that within two months of trial he was re-committed to a mental health facility. What more does the majority believe is necessary before it finds an abuse of discretion for failure to order an examination?

The majority, however, is unrelenting. In support of their decision they state that the defense had seven psychiatric reports available to impeach Odom's testimony and thus they conclude that Gutman had "plenty of psychiatric ammunition to use against Odom." With regard to quantity, this may be true, but if quality and relevance are factors in evaluating evidence, these reports were of little worth. Gutman's concern was with Odom's mental state at the time he testified, not with his mental state some nine months (the age of the most recent psychiatric report at the time of trial) to 38 years (the first reference to a psychiatric problem in the reports)[9] prior to that date. I do not understand how the majority can fail to recognize the substantially depreciated value of this outdated psychiatric evidence to the questions of Odom's competency and credibility at the time of trial.

---

7: *Hyson* illustrates the effect drugs can have on the competence of a witness. In this regard it should be pointed out that while testimony was received that Odom was prescribed drugs for his condition, I can find nothing in the record which would indicate that the court inquired as to the possible effect those drugs might have on his testimony.

8. Notwithstanding its prior decision, the confusion in Odom's testimony should have prompted the trial court to order an immediate psychiatric examination before allowing him to continue to testify. *See United States v. Hyson*, 721 F.2d 856 (1st Cir.1983) where the First Circuit approved the trial court's *sua sponte* order of a medical examination of a witness to determine his competency to testify after the witness began having difficulty speaking and a concern was raised as to whether the witness had ingested drugs prior to taking the stand.

9. This reference is to his discharge from the Army for "psychoneurosis" in 1944.

Based on the foregoing analysis, I conclude that the trial court abused its discretion in refusing to order Odom to undergo a psychiatric examination and that this error cannot be characterized as harmless under any circumstance due to the importance of Odom's testimony to the Government's case.[10] By taking this position I do not mean to infer that I believe that any time a defendant alleges that a witness has a mental problem that a psychiatric examination must be ordered. I recognize that psychiatric examinations, if freely ordered by trial courts on defense counsel's mere allegation of mental instability, could pose a serious threat to the truth-finding process by providing a potent tool to harass and intimidate witnesses. If, however, the ordering of such examinations is limited to narrowly defined circumstances, as in the present case, the witness's privacy interests (including the possible problems of harassment) are outweighed by the need for relevant psychiatric evidence.

As the preceding statement implies, before a psychiatric examination is ever ordered the requesting litigant must be required to demonstrate a substantial need for such evidence. In the present case, such a need is apparent since a current psychiatric examination would provide Gutman with the most relevant evidence to attack the credibility of Odom who, as has already been noted, had a very questionable mental history and was crucial to the government's case. There are several other factors, however, beyond the need for psychiatric evidence which must be taken into account in the determination of whether or not to order an examination.

In *United States v. Raineri*, 670 F.2d 702 (7th Cir.), *cert. denied*, 459 U.S. 1035, 103 S.Ct. 446, 74 L.Ed.2d 601 (1982), our court enunciated three factors to be considered by trial courts which weigh against an order of a psychiatric examination.

"The district court has broad discretion in determining whether to compel a witness to undergo a psychiatric examination. . . . In exercising this discretion the court must consider [1] the infringement on a witness's privacy, [2] the opportunity for harassment, and [3] the possibility that an examination will hamper law enforcement by deterring witnesses from coming forward."

*Id.* at 709 (citations omitted). Against these factors must be balanced the two criteria delineated by McCormick:

"A discretionary power has been recognized in a few instances, granting the judge the power to order an examination of a prosecuting witness, but the conditions for exercising that discretion are unclear. It seems the power to exercise discretion should exist in any type of case, to be exercised not only upon the bases of whether undue expenditure of time or expense and undue distraction will result, but also upon the bases of [1] whether the witness is a *key* witness and [2] whether there are *substantial* indications that the witness is suffering from mental abnormality at the time of trial or was so suffering at the time of the happening about which he testifies."

McCormick, *McCormick on Evidence*, § 45 at 96–97 (2d ed. 1972) (emphasis added, footnotes omitted).

When the above factors are applied to the facts in the present case they clearly favor an order of a psychiatric examination. The *Raineri* criteria are easily met. With regard to that decision's first criterion, any infringement of Odom's privacy would have been minimal since he expressly waived his physician/patient privilege when he agreed to testify pursuant to his plea bargain with the government. Thus, Odom's privacy was already compromised as his prior psychiatric examinations were released when he waived his physician/patient privilege.

---

**10.** Although ordering a psychiatric examination would have been the best course of action, at the very least the trial court could have appointed a psychiatrist to observe Odom while he testified. By using this procedure, the trial court could have obtained expert advice from the psychiatrist as to the competency and reliability of Odom's testimony.

With respect to the second *Raineri* criterion, it can hardly be contended that Gutman's motion for a psychiatric examination was for the purpose of harassment after the disclosure of Odom's recent history of psychiatric problems particularly in conjunction with the stress surrounding court proceedings.[11] On the contrary, an obvious need for *current* psychiatric evidence arose due to the substantial question surrounding the credibility of this key government witness.

Finally, with regard to the third *Raineri* criterion, it cannot be denied that ordering a witness to undergo a psychiatric examination might deter others having past mental problems from coming forward as witnesses. This risk is minimal in the present case, however, since Odom agreed to testify as his part of a plea bargain. In addition, under my analysis the risk of deterrence is reduced to the bare minimum since an order of an examination is warranted *only in extreme circumstances,* as here, where a key witness has a recent history of serious psychiatric problems thereby calling into question his reliability. The preceding analysis also clearly demonstrates that both of the McCormick criteria favor an order of a psychiatric examination since Odom was a key witness, and his documented recent mental history raised serious doubts about his competency and reliability.

It is worth repeating that a psychiatric examination should only be ordered in extreme circumstances, such as those present here, to avoid harassment and invasion of a witness's privacy. However, if trial courts conduct a careful weighing of the above-enunciated factors when determining the need for such an examination, they will safeguard and preserve the witness's rights while at the same time protect the defendant's constitutional right to a fair trial.

I now turn to a discussion of a concern I have with the government's decision to oppose Gutman's motion for a psychiatric examination of Odom. A prosecutor's duty is not merely to gain convictions, rather his main task is to obtain justice. *See* ABA Standards for Criminal Justice 3–1.1(c) (2d ed. 1980). This obligation to insure that justice is done was recognized by Justice Sutherland in *Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

> "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."

*Id.* at 88, 55 S.Ct. at 633. The recently adopted Model Rules of Professional Conduct are in accord with the Supreme Court's position:

> "A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence."

ABA Model Rules of Professional Conduct, Rule 3.8 comment (1983). The ABA Standards for Criminal Justice amplify this concept of the prosecutor as a minister of justice by providing that:

> "It is unprofessional conduct for a prosecutor intentionally to avoid pursuit of evidence because he or she believes it will damage the prosecution's case or aid the accused."

ABA Standards 3–3.11(c). *See also* former ABA Model Code of Professional Responsi-

---

11. Note that Odom was still a defendant in this action until three days before trial. This fact would also tend to increase the stress Odom was experiencing.

bility, EC 7–13. Thus, it should be apparent that:

> "A prosecutor may not properly refrain from investigation in order to avoid coming into possession of evidence that may weaken the prosecution's case, independent of whether disclosure to the defense may be required. The duty of the prosecutor is to acquire all the relevant evidence without regard to its impact on the success of the prosecution."

ABA Standards 3–3.11 commentary. I am troubled by the thought that the government's opposition to Gutman's motion for an order compelling Odom to undergo a psychiatric examination may well have been motivated by a fear of what might be discovered. If this actually was the government's motive, was justice done? I am left with a serious concern that the prosecution, by opposing Gutman's motion for a psychiatric examination, may have come close to violating its obligation to see that justice is obtained on behalf of both the government and the defendant.

Although the case law addressing this issue is somewhat sparse, I am not alone in my conviction that cooperation between defense and government counsel is necessary, in circumstances such as those presented here, to obtain a fair result at trial. The Supreme Court of New Jersey enunciated this same proposition in *State v. Butler,* 27 N.J. 560, 143 A.2d 530 (1958). The government, in that case, had obtained a psychiatric examination of a key witness but had opposed the defendants' request to obtain a separate examination of that witness. In addition, the trial court had only offered to release those portions of the government's reports which showed the doctors' opinion regarding the witness's competency. The appellate court stated:

> "The trial of a criminal cause is a quest for truth and justice, not merely a contest for a tactical advantage over an adversary or for a favorable verdict irrespective of its relation to the basic objective of the proceedings. When reasonable ground for doubt as to the person's mental capacity as a witness becomes known to the parties and to the court, and lives may depend upon his testimony, the proper administration of justice in the public interest ought to stimulate a cooperative voluntary effort to establish a means of mutual solution of the problem. A variety of methods suggest themselves: agreement (a) that the court may appoint an impartial expert, (b) that each party may select one expert and the court a third, for joint examination, or (c) that each party may engage the services of an independent expert."

*Id.* 143 A.2d at 553.

## C. Motion to Strike Odom's Testimony.

The defendant's final contention is that the trial court erred in refusing to strike Odom's testimony as not credible as a matter of law. As I noted at the outset of this dissent, the admissibility of evidence is a preliminary question entrusted to the discretion of the trial judge, Fed.R.Evid. 104(a); such discretion being subject to review for abuse. To establish abuse, the defendant must show that the admission or exclusion of evidence was in error and affected his substantial rights. Fed.R.Evid. 103. I believe that Gutman also met this burden with respect to the trial court's denial of his motion to strike Odom's testimony.

Essentially, this last argument is a continuation of the defendant's first argument in that he contends, assuming Odom appeared to meet a minimum standard of competence at the outset, his testimony was so confusing and contradictory that it should have been excluded as not credible as a matter of law. If evidence lacks credibility as a matter of law, then it is not relevant under Fed.R.Evid. 401 since it then does not tend "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Such evidence must be excluded. Fed.R.Evid. 402. As Weinstein points out, "the trial judge may exclude all or a part of the witness' testimony on the ground that no one could reasonably believe the witness could have observed, remembered, commu-

nicated or told the truth with respect to the event in question." 3 Weinstein and Berger, *Weinstein's Evidence* ¶ 601[01] (1982) (footnote omitted). While the preceding quote is found in Weinstein's discussion concerning competency, it is equally applicable to a motion to strike testimony that manifests the problems which were the basis for a previous motion contesting that witness's competency.

After a complete examination of Odom's testimony I have come to the conclusion that it should have been stricken and that the trial court's failure to do so was reversible error. Due to space limitations I cannot reprint the whole of his testimony, however, I believe the following excerpts adequately support my conclusion.

On direct examination Odom testified:

"Q In the summer of 1974 did Albert Dudley, the President of the South Shore Railroad, have a conversation with you about getting legislation passed for a Regional Transportation Authority?

"A Yes, sir.

"Q What, if anything, did you do?

"A Mr. Darst, I have been lying about this thing and I want to tell the truth.

"Q All right. What did you do after Mr. Dudley came to you?

"A Well, I went to see the senator.

"Q Which senator?

"A Senator—Senator Gutman.

"Q And what did you say to him and what did he say to you?

"A That's what I told the Grand Jury, and I lied to the Grand Jury, Mr. Darst.

"Q Well, would you tell the Jury what Mr. Gutman said and what you said?

"A Well, I can tell you what I said, but it's not so.

"Q Well, we just want the truth. You understand you are under oath?

"A I understand I'm under oath. That's why I'm telling you that I lied about it, Mr. Darst.

"Q Okay. So now would you tell the Jury the truth?

"A The truth is, I guess, that I just lied about this thing.

"Q Tell the Jury what the truth is.

"A And that the truth is that I made this deal with them and it was not extortion and it was not bribery."

At this point Gutman moved to have all the other crime evidence regarding the $40,000 excluded from the case. That motion was denied by the court. Somewhat later in his direct examination Odom testified:

"Q Now, when you had a conversation with Mr. Gutman as to the Regional Transportation Authority in May of 1975, what did Mr. Gutman say to you and what did you say to Mr. Gutman?

"A Well, I know what I told the FBI, but that was a lie.

"Q Well, would you tell the Jury what the truth is?

"A Well, the truth is that there was no bribery there.

"Q Tell the Jury what Mr. Gutman said to you and what you said to Mr. Gutman.

"A I don't guess we had a conversation.

"Q On December 29th and December 30th did you go to the—excuse me. On December 29 did you go to the Noblesville Police Department?

"A Yes, sir.

"Q And after you went to the Noblesville Police Department didn't you have a conversation with FBI agents Ronald Hawley and Wayne Oakes of the Federal Bureau of Investigation?

"A Yes, sir.

"Q And on those dates did you make the following statement to Agents Hawley and Oakes:" [His statement to the FBI followed verbatim.]

Regarding that same line of questioning at a subsequent point in his direct examination, Odom testified:

"Q In May of 1975, when you had the conversation with Mr. Gutman about

the Regional Transportation Authority, did you state to Mr. Gutman that you thought you could get some money?

"A No, sir.

"Q All right. Did you state to the—let's see. Did you read the document that I handed you?

"A Yes, sir.

"Q Does that refresh your recollection?

"A Yes, sir.

"Q Would you state to the Jury what was said in that conversation?

"A Just that we needed the bill, and he said he would have to turn his people around.

"Q And what did you offer in order to turn his people around?

"A I didn't offer anything.

"Q Did you make the following statement to him, that you told Mr. Gutman you thought you could get $25,000 for Gutman from Dudley?

"A No, sir.

"Q And did you tell the FBI that?

"A Yes.

"Q On December 29 and December 30th of 1980?

"A Yes, sir.

"Q Now, on that date, when you talked to the FBI agents, you went voluntarily to the FBI, did you not?

"A Yes, sir."

However, Odom then changed his mind.

"Q Now, before you received that $40,000 bill from Mr. Gutman, it's your testimony today that you received—you had no conversation with Mr. Gutman about that bill?

"A I don't—I changed the bill. I called him and had it changed.

"Q Now, let's take one step at a time. Before you received the bill from Mr. Gutman for $40,000, you testified that you had had no conversation with Mr. Gutman, is that correct?

"A I guess I did testify to that.

"Q Is that the truth?

"A I don't—no, it's not the truth.

"Q Would you tell the Jury what the truth is?

"A I guess the truth had to be about something for the Penn Central, is what he said. I don't remember.

"Q Do you remember what he said?

"A No, sir. I remember what he said when he come in the office about the bill.

"Q Would you tell the Jury?

"A He said that I had worked hard on the bill and that there was 40,000—20, 25 wasn't enough, that 40,000 was—that it was worth $40,000.

"Q What was worth $40,000?

"A The bill.

"Q What bill was that?

"A RTA."

Then on cross-examination Odom testified:

"Q Did you testify in your examination here this morning that you had ripped Mr. Dudley off?

"A Yes, that's what I said.

"Q Now, I believe you also testified that you lied under oath in the Grand Jury about this $40,000 transaction?

"A You know, when I think about it I didn't lie about that 40,000. I talked to Mr. Gutman and that's all there was to it about that money.

"Q Well, are you saying now that you were mistaken that you had lied in the Grand Jury?

"A The first part of the Grand Jury report I lied about.

"Q What part was that?

"A About the Edwards thing.

"Q About—

"A About the $1,000.

"Q You lied here today about that?

"A No, that's the truth, the way I told it.

"Q Today?

"A That's the truth, the way I told it to the Grand Jury.

"Q Well, what parts did you lie about to the Grand Jury?

"A I don't think I lied to the Grand Jury, now that I think about it.

"Q The more you reflect on it you don't think you lied to the Grand Jury?

"A No."

With regard to a letter he had sent to an employee of one of the member railroads of the Indiana Railroad Association, Odom explained:

"Q And didn't you inform Mr. Henderson, in addition to this letter, that these were expenses incurred a long time ago to Mr. Edwards, payable over a period of five years at $12,000 per annum?

"A I did.

"Q Did you lie to Mr. Henderson?

"A (No response)

"Q You didn't lie to him on that, did you?

"A Well, like I told you, I don't know why I paid Senator Edwards.

"Q You don't know why now?

"A No, doesn't make sense."

It should be pointed out that Odom, in addition to the above inconsistencies and contrary to the majority's characterization, did not testify consistently about the $1,005 payments which were the very substance of the charge of extortion. On direct Odom stated:

"Q What, if anything, did Mr. Gardner say to you, and what did you say to Mr. Gardner?

"A Well, we started negotiating on the price of payments.

"Q Well, would you tell the Jury what Mr. Gardner said to you?

"A He said that they worked hard on the bill, and so we negotiated some payments.

"Q Did he say who had worked hard on the bill?

"A He and Mr. Gutman and Chip [Senator Edwards].

"Q And you have told us that you started negotiating. Would you tell the Jury what Mr. Gardner first said about that?

"A I don't remember what he first said.

"Q O.K. Can you tell the Jury what you remember Mr. Gardner saying?

"A Well, he wanted some earnest money, $1,500, right off the bat.

\* \* \* \* \* \*

"Q Did you make any other payments to Mr. Gardner, Mr. Gutman or Mr. Edwards?

"A $1,005 a month for five years."

Then on redirect he stated:

"Q Now, you talked on cross-examination about legal fees for Mr. Edwards. Mr. Edwards did receive legal fees for his work before the Public Service Commission, did he not?

"A Yes.

"Q And do you remember that he received $8,000 plus $15,000, plus $5,000?

"A Yes, sir.

"Q And from the $5,000, of course, was deducted your $2,000, is that correct?

"A Yes.

"Q Is that what you were talking about on cross-examination when you were talking about legal fees?

"A No, sir.

"Q What were you talking about when you were talking about legal fees?

"A *That ten-o-five.*"

(Emphasis added.) Presumably this last answer concerns the $1,005 monthly payment which was the basis for the charges against Gutman. Note that he characterizes this payment as *legal fees.* Later in his redirect examination he perpetuates this characterization.

"Q Now, I believe Mr. Bradford asked you on cross-examination the conclusion of whether or not you considered this extortion, and what was your answer to him?

"A No, sir.

"Q And why not?

"A Well, because I freely gave it to him.

"Q You gave that with your consent, did you not?

"A Yes.

"Q After the senators told you those statements, you consented then to pay them $1,005 per month?

"A *Yes, but that was for Public Service Commission representation.*"

(Emphasis added.) After this statement the question becomes whether any payments were made in return for legislative help, or rather were they merely legitimate legal fees.[12]

Based on the foregoing sampling of the more significant inconsistencies, I am compelled to conclude that Odom lacked credibility as a matter of law. I might not have reached this conclusion had there been no evidence of prior mental history (which indicated both that Odom suffered from a psychotic thought disorder that caused him to have difficulty being relevant and that increased stress, such as his Grand Jury testimony, caused him to slip back into a psychotic mental state) or had there been a recent psychiatric examination indicating mental competence. However, since neither was the case, I cannot conclude that Odom coherently testified and thereby cured the trial court's error in failing to hold a competency hearing and failing to order a psychiatric examination. While normally credibility is a question for the jury, *United States v. Bradshaw,* 719 F.2d 907, 921 (7th Cir.1983), the trial court continues to retain the discretion to exclude testimony if *no* reasonable juror could believe it. 3 Weinstein and Berger, *Weinstein's Evidence* ¶ 601[01] (1982). Such discretion should have been exercised here and therefore the trial court erred in failing to strike Odom's testimony. Furthermore, there can be no doubt that this failure to strike affected a substantial right of the defendant, Fed.R.Evid. 103(a), since Odom was the sole witness to directly testify to an essential element of the charge of extortion in violation of 18 U.S.C. § 1951—the misuse of his official position to extort money. Without Odom's testimony I do not believe the other circumstantial evidence offered would have supported the conviction.

The majority argues that the inconsistencies in Odom's testimony were innocuous, however, it is my position that they have completely missed Gutman's argument since he did not argue that the evidence should be struck merely because it was inconsistent (as the majority states), rather Gutman argues that the inconsistencies in conjunction with the evidence of Odom's mental instability made his testimony unbelievable as a matter of law. As the preceding analysis indicates, I agree.

Even if Odom's testimony was not found to be completely incredible, that evidence should have been struck pursuant to Fed.R. Evid. 403. As a result of the magnitude of the inconsistencies and contradictions apparent in Odom's testimony, at the very best it was relevant only to show that Gutman was involved in some form of shady dealings. One could not conclude from Odom's testimony that Gutman misused his official position (by threats of legislative inaction) to extort money from the IRA because of the previously noted contradictions on this very issue. Thus, viewing Odom's testimony in the light most favorable to the government, it merely implies some indeterminate wrongful conduct on Gutman's part which is highly prejudicial in a Rule 403 sense as it tends to induce the jury to convict on an improper basis, e.g., that Gutman is a bad person as opposed to actual proof beyond a reasonable doubt on each and every element of the offense charged. Testimony which tends to induce a jury decision on an improper basis is exactly the type of evidence intended to be excluded under 403 if the prejudicial effect of such evidence substantially outweighs its probative value. *See* Graham, *Handbook of Federal Evidence* § 403.1 at 183–84 (1981). Our circuit has held that abuse of discretion is the standard to be used in reviewing a trial court's balancing under Rule 403 of the probative value of evidence against its prejudicial impact. *United States v. Weston,* 708 F.2d 302, 308 (7th Cir.1983). In my opinion, there is no question that the trial court abused its discretion in this case. At best, as has just been indicated, the probative value of the evidence was minimal. Al-

---

**12.** The majority states that they do not find "any abnormal degree of internal inconsistency" in Odom's testimony. I believe the preceding excerpts dispel this conclusion. Furthermore, I do not believe that Odom's testimony can be compared to a normal witness who changes his story on the stand as the majority attempts to do. His prior mental history distinguishes this case from such a "normal" change in story.

though it went to a key issue—abuse of official position to extort money—the testimony was inconsistent and contradictory on this very point and was additionally suspect because of the other contradictions found in Odom's testimony and his prior history of mental problems. Thus, when the probative value of Odom's testimony is weighed against the prejudicial effect of inducing a decision on an improper basis, abuse for failure to strike becomes apparent.[13]

### III.

Based on the foregoing analysis, I would hold that the trial court abused its discretion in: (1) failing to conduct a hearing regarding Odom's competence to testify; (2) failing to order Odom to undergo a psychiatric examination before allowing him to testify; and (3) failing to strike Odom's testimony in light of his numerous contradictory statements. I do not deny that the record contains evidence that infers Gutman's guilt beyond a reasonable doubt and appears to favor an affirmance of the verdict, but the magnitude of the trial court's errors leading up to the conviction in this case raise in my mind substantial questions concerning the fairness of the defendant's trial which must not be ignored, and persuade me to reach the preceding conclusion. The trial court in this case was faced with a co-defendant who at the last moment turned state's evidence as his part of a plea bargain. That witness turned out to be crucial to the government's case. The facts indicated that the witness's competency was in serious doubt. Notwithstanding these doubts, Gutman was denied the opportunity to demonstrate that the witness could not provide relevant credible testimony. He was also denied the most relevant evidence to attack that witness's credibility, i.e., a current psychiatric examination. The witness then proceeded to provide testimony which contained numerous inconsistencies and contradictions. As is apparent from the majority opinion, evidence of a similar criminal act was admitted which was supported by highly questionable foundation testimony (Odom's). Finally, the jurors in this case learned that a co-defendant, Edwards, pleaded guilty to conspiring with Gutman. While I believe that the trial court's errors concerning the admissibility of Odom's testimony require reversal and therefore do not reach these latter two issues, even if I were to determine that none of the attacks on the conviction, standing alone, were sufficient to warrant reversal, when combined these attacks rise to the level of a denial of a fair trial in violation of the Fifth Amendment. For this reason, and the reasons stated above, I would reverse and remand for a new trial.

### ON PETITION FOR REHEARING

COFFEY, Circuit Judge, with whom FLAUM, Circuit Judge, joins.

With all due respect, I feel compelled to dissent to this court's decision to deny rehearing. In addition to the views expressed in my dissent, I believe that this court's reasoning in the recent *United States v. Johns*, 728 F.2d 953 (7th Cir.1984) decision warrants a rehearing in the instant case. In *Johns*, our court remanded to the district court for a determination of the defendant's competency at the time of that court's proceedings due to its original failure to order a psychiatric examination. In light of *Johns*, where the question of sanity was much less pronounced, I believe the somewhat inconsistent result in the present case necessitates a rehearing. For the record, I think it also should be noted that within two months of Gutman's conviction, Odom was recommitted to a mental health facility by court order.

---

**13.** If the trial court had stricken Odom's testimony it would have cured its error in failing to

(1) hold a competency hearing and (2) order a psychiatric examination.