UNITED STATES of America, Appellee,

v.

Robert HYSON, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Edward ENNIS, a/k/a "Tiger", Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Richard GOMES, Defendant, Appellant.

Nos. 82–1837, 82–1838 and 82–1911.

United States Court of Appeals, First Circuit.

Argued Aug. 3, 1983.

Decided Nov. 23, 1983.

Thomas R. DeSimone, Providence, R.I., with whom Robert S. Ciresi, North Providence, R.I., was on brief, for Robert Hyson.

Edward J. Romano, Providence, R.I., with whom John F. Cicilline, Providence, R.I., was on brief, for Edward Ennis and Richard Gomes.

William C. Bryson, Attorney, Washington, D.C., with whom Lincoln C. Almond, U.S. Atty., and Edwin J. Gayle, Sp. Atty., were on brief, for appellee.

Before CAMPBELL, Chief Judge, BOWNES, Circuit Judge, and PEREZ–GIMENEZ,* District Judge.

* Of the District of Puerto Rico, sitting by designation.

BOWNES, Circuit Judge.

This is an appeal by defendants-appellants Richard Gomes, Edward Ennis and Robert Hyson from jury convictions of conspiring with Federick Martineau to distribute and to possess with intent to distribute heroin, marijuana, hashish and cocaine in violation of 21 U.S.C. § 846.[1] Gomes and Ennis have filed consolidated briefs; Hyson has appealed separately. We reverse the conviction of Gomes and affirm the convictions of Ennis and Hyson.

## I. Whether the District Court Properly Denied the Motion of Hyson to Suppress

The pertinent evidence adduced at the motion to suppress is summarized as follows.[2] Hyson allowed Gomes and his girl friend to live in an apartment which Hyson had rented. Hyson had used the apartment sporadically, but it was not his regular residence either prior to or at the time of the search and seizure. Gomes and his girl friend had occupied the apartment for five weeks prior to the search and seizure.

The FBI had an arrest warrant for Gomes charging him with unlawful flight to avoid prosecution for extortion. Agents Shay and Hargreaves received information that Gomes and his girl friend, Janet Armstrong, were living in an apartment house in Rehoboth, Massachusetts. The two FBI agents followed Armstrong to the house and she was observed entering an apartment. A male voice was heard after Armstrong went into the apartment. The agents ascertained from another tenant in the building that a man matching Gomes' description was living in the apartment. The agents entered the apartment and arrested Gomes. Gomes told them, "there's a bag of hashish in the closet and its not mine." The agents seized a travel bag from the closet which contained seven and a half kilograms of hashish, packaged in fifteen separate 500-gram bags. It is this evidence which Hyson sought to suppress.

In denying the motion to suppress, the district court found that Gomes was dwelling in the apartment at the time of his arrest, that he was a "co-owner" and in "co-control" of the apartment along with Hyson, that Gomes consented to the seizure of the hashish, and that Hyson was bound by Gomes' consent.

We begin our analysis by noting that the district court's findings of fact are subject to the clearly erroneous standard of review. *United States v. Annese,* 631 F.2d 1041 (1st Cir.1980); *United States v. Romano,* 583 F.2d 1, 7 (1st Cir.1978); *United States v. Christian,* 571 F.2d 64, 66 (1st Cir.1978). The evidence was sufficient to sustain the district court's finding that Gomes had common control of the apartment along with Hyson. Hyson was the one who rented the apartment, but he did not live there. He allowed Gomes to occupy it, which Gomes did for a period of five weeks prior to his arrest. Hyson has not claimed that the closet in which the hashish was found was restricted for his own personal use.

The holding and reasoning of *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), are applicable.

These cases at least make clear that when the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.[7]

---

[7] Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, *see Chapman v. United States,* 365 U.S. 610 [81 S.Ct. 776, 5 L.Ed.2d 828] (1961) (landlord could not validly consent to the search of a house he

---

1. Martineau pleaded guilty prior to trial. Another defendant, Kevin Hanrahan, was acquitted.

2. Gomes also brought a motion to suppress. Our finding that there was not sufficient evidence to convict Gomes assumes that the evidence seized was admissible as to him.

had rented to another), *Stoner v. California,* 376 U.S. 483 [84 S.Ct. 889, 11 L.Ed.2d 856] (1964) (night hotel clerk could not validly consent to search of customer's room) but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, *so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.*

*Id.* at 171, 94 S.Ct. at 993 (emphasis added).

Hyson also contends that the case of *Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981), precludes the use of the hashish as evidence against Hyson. The question in *Steagald* was "whether an arrest warrant—as opposed to a search warrant—is adequate to protect the Fourth Amendment interests of persons not named in the warrant when their homes are searched without their consent and in the absence of exigent circumstances." *Id.* at 212, 101 S.Ct. at 1648. It seems obvious that *Steagald* simply does not apply. Here, the person named in the arrest warrant, Gomes, was occupying the premises with the consent and knowledge of the owner, Hyson. Gomes was not a guest or visitor at Hyson's home. The search and seizure was of an apartment in which Gomes lived and over which he had as much control as Hyson. By allowing Gomes to occupy the apartment, Hyson assumed the risk that Gomes might permit it to be searched.

Under the facts and the applicable law, the hashish was properly admitted as evidence against Hyson.

## II. *The Preliminary Credibility Instructions*

█ The first instruction the district court gave on credibility was not entirely correct. This, however, was immediately corrected. And most importantly, the final charge to the jury contained a credibility instruction that was complete, comprehensive and impeccable. There is no merit at all in this assignment of error.

## III. *The Evidence*

█ The rest of the issues raised requires a review of the evidence, including all rea-

sonable inferences which may be drawn therefrom, in the light most favorable to the government. *United States v. Fortes,* 619 F.2d 108, 122 (1st Cir.1980).

The government's case was based on the testimony of an informant, Nelson Monteiro, and on the testimony of Federal Drug Enforcement Agency (DEA) agents who conducted surveillances by observation and "bugs" of Frederick Martineau and his associates. The evidence adduced showed that Martineau, who pleaded guilty prior to trial, but did not testify, was a large-scale dealer in heroin, cocaine, hashish, and marijuana.

█ The basic issue is whether the evidence was sufficient for a jury finding that defendants Hyson, Ennis and Gomes conspired with Martineau to possess and distribute illegal drugs in Massachusetts and in Rhode Island. The government had to prove beyond a reasonable doubt that each defendant had the specific intent to violate the substantive statute, *United States v. Mora,* 598 F.2d 682, 683 (1st Cir.1979); such proof can be largely circumstantial. *United States v. Bithoney,* 631 F.2d 1, 5 (1st Cir. 1980), *cert. denied,* 449 U.S. 1083, 101 S.Ct. 869, 66 L.Ed.2d 808 (1981).

Martineau approached Monteiro in the summer of 1981 about selling marijuana and Monteiro agreed to do so. A short time later, five pounds of marijuana was turned over to Monteiro on the understanding that after it was sold Martineau would be paid $1500. Two pounds of the marijuana was stolen. Monteiro's wife sold the rest and paid Martineau $700. Martineau, along with Kevin Hanrahan, came to Monteiro's home to collect the balance due of $800. Hanrahan physically assaulted Monteiro and he was told that if he did not pay the money both his legs would be broken. This collection attempt proved to be Martineau's undoing because it resulted in Monteiro contacting the DEA. He thereafter became a paid informant.

Monteiro started his informant duties with the purchase of a sample package of heroin from Martineau for $300. The money was furnished by the DEA and the pur-

chase was witnessed by a DEA undercover agent. A few days after this purchase Martineau offered to sell Monteiro half an ounce of heroin for $3500. This was followed by a visit from Hyson and Ennis to Monteiro. They told him that they "wanted to get the ball rolling," and that "they were holding the stuff." Monteiro told them that he would get back to them. Before they drove away, Monteiro noticed Hyson pick a Marlboro cigarette box out of the gutter.

Martineau and Ennis visited Monteiro some days later. Ennis got out of the car and told Monteiro to walk with him. When they got to an open field Ennis pointed to a Marlboro cigarette box. Monteiro picked up the box and, after Martineau and Ennis left, delivered it to the DEA agents. The box contained almost thirteen grams of heroin. Later that same day Martineau and Monteiro went to Spumoni's Restaurant in Pawtucket. They met with two DEA undercover agents whom Monteiro introduced as "his partners." One of the agents paid Martineau $3500.

The agents met Martineau again the next day at the same place. Martineau said he had five people working with him. He offered heroin to the agents at a price of $3000 a half an ounce, $6000 for an ounce. The agents were given a phone number at which Martineau could be reached; this was a paging service number in Ennis' name.

One of the DEA agents called Martineau at the number given them and there was another meeting at Spumoni's Restaurant. The agent told Martineau he wanted to buy a half an ounce of heroin. Martineau said this would take less than half an hour. He left the restaurant and returned within thirty minutes with Ennis. Ennis inquired of the bartender where the men's room was and then headed in that direction. Martineau then told the agent that the heroin would be in the trash can in the men's room. After Ennis returned to the bar, the agent went to the men's room and retrieved a package from the trash can which contained about fourteen grams of twenty-five

percent pure heroin. Martineau was paid $3000 in cash for the heroin.

Another meeting at Spumoni's was held several weeks later between Martineau and Ennis and the two undercover agents. One of the agents asked to buy half an ounce of heroin. Martineau told the agent that he also had a lot of cocaine available. Martineau and Ennis left the restaurant and returned in about twenty minutes. The same scenario as before was followed. Ennis went to the men's room. Martineau told one of the agents that the heroin was under the trash can in the men's room. It was retrieved and found to contain about twenty-eight grams of sixteen percent pure heroin. A short time later Ennis left the restaurant and returned with a package that he gave to Martineau, which he in turn gave to the agents. This package contained almost one gram of cocaine. Martineau was paid $3000 for the heroin.

■ This evidence was clearly sufficient for a finding beyond a reasonable doubt that Ennis knowingly and actively participated with Martineau in the sale of illegal drugs. We now turn to the evidence connecting Hyson to the Martineau enterprise.

■ John Sanders, one of Martineau's marijuana salesmen, testified that to pay off a debt of $2000 owed Martineau he gave him a black Dodge van. Shortly after the transfer of the van to Martineau, it was registered in Hyson's name. Hyson was observed driving the van on many occasions. He was also seen by DEA agents in the company of Martineau and Ennis. One of Hyson's female companions, Janet O'Brien, testified that, using cocaine furnished by Hyson, she "snorted coke" with him on two occasions. Finally, and most significantly, there was evidence from a notebook in which Martineau recorded his marijuana dealings that connected Hyson directly to Martineau's drug business. Although the evidence linking Hyson and Martineau was not as overwhelming as that establishing the Ennis participation in the conspiracy, it was a sufficient foundation for the jury finding.

Finally, we consider whether the evidence was sufficient for finding beyond a reasonable doubt that Gomes was a knowing participant in the drug-dealing conspiracy. The only evidence linking Gomes to Martineau, Ennis and Hyson came from the events surrounding his arrest. In addition to the facts already stated in our discussion of the motion to suppress, two other pieces of evidence must be considered.

Sometime after the FBI agents had entered the apartment occupied by Gomes, the telephone rang. Agent Shay picked up the phone and a voice at the other end said, "Richie?". Shay replied, "No, Richie is busy." Gomes' first name is Richard. An exchange of "who's this" by the person calling and Shay followed. About ten minutes later Ennis entered the apartment. He denied knowing Gomes or Hyson and anything about the hashish. He said that he came to the apartment looking for a girl. Ennis answered questions and talked to the agents for ten or fifteen minutes. Shay testified that the voice on the phone was that of Ennis.

Shay also testified during rebuttal that, after questioning, Gomes told him that the apartment belonged to Hyson and that he was introduced to Hyson six weeks prior by Martineau and Ennis.

■ Viewing the evidence and all the reasonable inferences that can be drawn therefrom, we do not think it sufficed for a finding beyond a reasonable doubt that Gomes was part of the Martineau-Ennis-Hyson drug-dealing conspiracy. The most that the evidence showed was that Gomes knew Martineau and Ennis, that he occupied an apartment rented by Hyson and that he knew there was a cache of hashish in the bedroom closet. This was sufficient to convict Gomes of possession of hashish, but he was not charged with that. He was charged with intentionally conspiring with Martineau, Ennis and Hyson to distribute and possess with intent to distribute heroin, marijuana, hashish and cocaine. This required proof that Gomes was aware of the purpose of the conspiracy and willingly participated with the intent to advance its pur-

pose. *United States v. Morris,* 700 F.2d 427, 433 (1st Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 2128, 77 L.Ed.2d 1306 (1983); *United States v. Previte,* 648 F.2d 73, 81–82 (1st Cir.1981). Gomes' occupancy of the apartment with knowledge that hashish was being stored there is not sufficient. Nor does association with Martineau, Ennis and Hyson establish guilt.

Mere association between the principal and those accused of aiding and abetting is not sufficient to establish guilt. *Ramirez v. United States,* 363 F.2d 33, 34 (9th Cir.1966); *United States v. Joiner,* 429 F.2d 489, 493 (5th Cir.1970); nor is mere presence at the scene and knowledge that a crime was to be committed sufficient to establish aiding and abetting. *Ramirez v. United States, supra; United States v. Garguilo,* 310 F.2d 249, 253 (2d Cir.1962). Mere presence at scene of crime is not evidence of guilt. *Hicks v. United States,* 150 U.S. 442, 447, 448, 14 S.Ct. 144 [145] 37 L.Ed. 1137 (1893).

*United States v. Francomano,* 554 F.2d 483, 486 (1st Cir.1977). *See also United States v. Johnson,* 513 F.2d 819, 823–24 (2d Cir. 1973) (mere presence at the scene of a crime even coupled with knowledge that a crime is being committed insufficient to prove membership in a conspiracy).

This case is similar to a recent Second Circuit case in which the court held that evidence of a defendant residing in an apartment used as a narcotics "cutting mill" where handguns were in plain view was not sufficient to convict of a conspiracy to distribute narcotics or a conspiracy to use a firearm to commit a felony. *United States v. Soto,* 716 F.2d 989 (2d Cir.1983). We realize that the defendant in *Soto* was a woman newly arrived from Puerto Rico with a young child but the legal principles are the same. The Second Circuit relied in part on our decisions in *United States v. Mehtala,* 578 F.2d 6 (1st Cir.1978), and *United States v. Francomano,* 554 F.2d 483, that presence at the scene of a crime does not establish a conspiracy to participate in that crime. *United States v. Soto,* at 992. *See also United States v. Pintado,* 715 F.2d 1501

(11th Cir.1983) (evidence that defendant was found hiding in closet in house where drug raid was made was insufficient to sustain conviction of participating in conspiracy to possess marijuana with intent to distribute and possession with intent to distribute).

The government argues before us, as it did to the jury, that Gomes' role in the conspiracy was to safeguard the hashish, "sit on it," pending its sale. There was no direct proof of this, nor, we think, could it be reasonably inferred from the evidence. There was no evidence as to how long the hashish was at the apartment. It could have been put there on the afternoon or early evening of the day of the arrest. Nor was there any evidence as to how frequently Hyson or the others visited the apartment. The fact that Ennis called Gomes and then came over to the apartment the night of the arrest is at least an indication that Ennis exercised some control over the cache of hashish. Unlike our brother, we find no basis for an inference of "knowing domain" by Gomes. It is just as likely that Gomes had no part in the conspiracy at all. The other defendants must have known that Gomes was a fugitive. His knowledge of the cache of hashish in the closet posed no danger to them; he was in no position to inform the police. Under the circumstances, it hardly makes sense that the others would allow Gomes to become a member of the drug-dealing enterprise. Gomes may have known what was going on, but there is no evidence that he participated in the conspiracy. We think the jury convicted Gomes on the basis of association and the fact that he was a fugitive. The conviction must be reversed.[3]

Our analysis of the evidence disposes of the contention that it was error to allow evidence of separate and distinct criminal conduct by Martineau. Martineau was the linchpin of the conspiracy. He was indicted along with Ennis, Hyson and Gomes. That he pled guilty prior to trial did not eliminate his role in the conspiracy

from the case. Evidence of Martineau's activities was necessary to show a conspiracy to possess and distribute drugs. Ennis and Hyson were firmly linked to those activities. There was no violation of Federal Rule of Evidence 403 on the grounds of undue prejudice or confusion.

IV. *Whether the District Court Erred in Allowing Monteiro to Testify*

During the first day of Monteiro's testimony defense counsel moved that he be examined to determine whether he was under the influence of drugs. The court asked Monteiro whether he had taken any medication before testifying and whether he took drugs. Monteiro replied in the negative to both questions and the motion was denied.

On the second day of his testimony Monteiro had difficulty speaking. The court, *sua sponte,* excused the jury and asked Monteiro if he had "natural difficulty in speaking" and whether he had taken any medication of any kind that morning. After Monteiro replied in the negative to both questions, the court asked him if he would be willing to be examined by a doctor and Monteiro said "Yes." A conference was then held with counsel and it was determined to proceed with the testimony of Monteiro. During cross-examination Monteiro denied that he had taken any drugs before testifying and said that he felt all right. A short time later, after being admonished by the court to speak up so the jury could hear his testimony, Monteiro said he needed a recess because "I don't feel good." After the jury was excused, the court suggested to counsel that the United States Attorney take Monteiro to the Veterans Hospital for a medical examination. Counsel agreed to this and Monteiro stated that he was willing to undergo a medical examination. The court explained to Monteiro that such examination would be to determine if "you have taken any sedatives of any kind, not necessarily heroin or marijuana, but whatever it might be." The

---

**3.** This finding makes it unnecessary for us to consider the denial of Gomes' motion for a new

trial which was based on a statement that Hyson made at the sentencing.

court and counsel agreed that Monteiro looked and acted as if he were sick.

Two days later, Dr. Thomas Laughran, the physician who examined Monteiro, testified. The jury, of course, was not present. The doctor stated that, based on his examination and tests conducted, Monteiro had been under the influence of phencyclidine when he was testifying which caused him to be in "an acute confusional state." Dr. Laughran explained that the ingestion of phencyclidine can cause acute intoxication but that he would expect this "to clear within twenty-four hours."

After discussion with counsel, the court asked the doctor to examine Monteiro again to determine whether or not he was now competent to testify. The examination was made. Dr. Laughran testified that he repeated the mental status examination he did two days prior and found Monteiro to be much improved, that his speech was clear and coherent, that he was able to concentrate on all questions asked, that his short-term memory was excellent, and that he was able to do calculations and interpret proverbs.

The court then recalled the jurors and explained the situation to them. He told them that all of Monteiro's testimony the second time he took the stand was stricken and was not to be considered. The court had the doctor's testimony describing both examinations and his conclusions read to the jury. Monteiro was then recalled as a witness.

 There was no error in the procedure followed by the district court. The competency of a witness to testify is for the trial judge. *United States v. Martino,* 648 F.2d 367, 389 (5th Cir.1981), *cert. denied,* 456 U.S. 943, 949, 102 S.Ct. 2007, 2020, 72 L.Ed.2d 465, 474 (1982). Federal Rule of Evidence 601 states in pertinent part, "[e]very person is competent to be a witness except as otherwise provided in these rules." There is no provision in the rules for the exclusion of testimony because a witness is mentally incompetent. The question of competency goes to the issue of credibility, which is for the trier of fact.

*See United States v. Lightly,* 677 F.2d 1027, 1028 (4th Cir.1982); *United States v. Roach,* 590 F.2d 181, 185–86 (5th Cir.1979).

The jury here had all the facts necessary for a reasoned credibility determination of Monteiro's testimony. We think the district court handled this matter admirably.

V. *The Jury Instructions*

A. *The Instruction on Flight*

Hyson was not present at the trial after the first day. Evidence was introduced by the government that it had tried to locate Hyson but had been unsuccessful. The court instructed the jury as follows:

Hyson has not been present during this trial, and I think that was, except for the first day, and this instruction that I am giving to you now I want to make perfectly clear to you does not apply in any way whatsoever to any of the other defendants in this case. I'm speaking only of Mr. Hyson. Is that perfectly clear, members of the jury? You all indicate "Yes." Okay. The intentional flight by a defendant after he is accused of a crime is not, of course, sufficient in itself to say a man is guilty, you could not do that, but it is a fact which, if proved, may be considered by the jury in the light of all other evidence in this case, in determining guilt or innocence. Whether or not evidence of flight shows a consciousness of guilt, and the significance to be attached to any such evidence, are matters exclusively within the province of the jury. Now, I repeat that this instruction, that this instruction only applies to Hyson. It does not apply to any of the other defendants.

 We can find no fault in this instruction. This circuit has expressly approved such a "flight instruction." *United States v. Grandmont,* 680 F.2d 867, 869–70 (1st Cir.1982). Nor was it error to allow the trial to proceed after Hyson's disappearance as long as there were proper limiting instructions. *United States v. Schwartz,* 535 F.2d 160, 165 (2d Cir.1976), *cert. denied,* 430 U.S. 906, 97 S.Ct. 1175, 51 L.Ed.2d 581 (1977); *United States v. Lobo,* 516 F.2d 883

(2d Cir.), *cert. denied,* 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975). The instruction was proper as to Hyson and adequately protected the rights of the other defendants.

### B. *The Conspiracy Instructions*

 There was no error of statement or omission in the court's instruction on the object of the conspiracy. The supplemental instructions on association with one or more members of a conspiracy and mere presence at the scene of a crime were correct. Moreover, after the supplemental instructions were given, the court inquired of defense counsel: "Are we all right now?" The reply was "I think so." Appellants Ennis and Hyson have no substantive grounds for objection to the supplemental instructions and, in any event, waived their rights to review of this part of the charge. Fed.R. Crim.P. 30.

### VI. *The Failure to Read a Portion of Ennis' Testimony to the Jury*

During its deliberations, the jury sent the following note to the court: "Defendant Ennis' testimony on July 8, '82 concerning where did he hear how Martineau got started selling drugs. Was Ennis in room when Fred Martineau gave testimony to the grand jury?"

The court discussed the note with counsel and defense counsel requested that Ennis' testimony be read back to the jury. The court refused and instructed the jury as follows:

> Your note can be interpreted one of two ways, either you are asking the Court to answer those questions, or you're asking the Court to have the testimony of Mr. Ennis read back to you. In either way, I cannot accede to your request. First, if you're asking for the answer to it, of course, that would be turning the whole role of the Court and the jury on its head, you are the finders of the facts, you, alone, decide what the facts are, you are the judges of the facts, and those findings must be based on the evidence that you heard. If it's a request to have the

> testimony read back, I decline that request. Mr. Ennis testified only yesterday, that testimony should be fresh in your mind, but more than that, I am not disposed to have the testimony of any witness taken out of context, because there was a full direct and a full cross, and all of this testimony would have to be read back, which I'm not disposed to have done.

 "The decision to reread testimony rests in the sound discretion of the trial court." *United States v. Almonte,* 594 F.2d 261, 265 (1st Cir.1979); *United States v. Pimental,* 645 F.2d 85, 87 (1st Cir.1981). The court did not abuse its discretion by failing to reread Ennis' testimony to the jury and we find no error in the way it answered the jury's question.

*The conviction of Richard Gomes is reversed; the convictions of Edward Ennis and Robert Hyson are affirmed.*

LEVIN H. CAMPBELL, Chief Judge (Concurring and Dissenting).

I concur in the reasoning and result of my colleagues on all points except the sufficiency of the evidence against Gomes. While the issue is close, I believe there is adequate evidence to support the verdict in his case.

The evidence "of course must be viewed in the light most favorable to the Government as the prevailing party." *United States v. Francomano,* 554 F.2d 483, 486 (1st Cir.1977). *See also United States v. Ciampaglia,* 628 F.2d 632, 626 (1st Cir.), *cert. denied,* 449 U.S. 956, 101 S.Ct. 365, 66 L.Ed.2d 221 (1980). It establishes that for five weeks prior to his arrest in the apartment, Gomes and his girlfriend were in sole possession of the apartment. It also establishes that Gomes had been allowed to use the apartment by drug conspirator Hyson, who—although the actual renter of the apartment—chose not to live there (suggesting that he had some other purpose for the apartment, such as storing drugs). When arrested, Gomes volunteered the presence of the hashish to the police and the

hashish was found stored in the very closet where Gomes kept his clothes. When found, it was wrapped in multiple packages for sale and constituted a very sizeable amount. There was also evidence that another conspirator, Ennis, maintained phone contact with Gomes, and that Gomes had met Martineau, a third conspirator.

This evidence indicates, beyond a reasonable doubt, that Gomes had been left in knowing control of the illegal hashish. From the very large quantity and the method of packaging, a jury could also infer that Gomes was well aware that the hashish was intended for sale—it was not simply the residue of a drug which the apartment owner might have had for his personal use. Just as unexplained possession of recently stolen property permits the inference of knowledge that the property was stolen, Barnes v. United States, 412 U.S. 837, 841–46, 93 S.Ct. 2357, 2360–63, 37 L.Ed.2d 380 (1973), possession of a commercial quantity of illegal drugs permits the inference of knowledge that the drugs are to be distributed. Further, the jury could reasonably infer that the other conspirators would never have allowed someone who was not a participant in their venture to possess and control the valuable contraband which they were in the business of selling. This inference is supported by United States v. Gainey, 380 U.S. 63, 67–68, 85 S.Ct. 754, 757–58, 13 L.Ed.2d 658 (1965), in which the Supreme Court upheld the inference that unexplained presence at an operating still is sufficient to convict the defendant of conducting the business of a distiller because "strangers to the illegal business rarely penetrate the curtain of secrecy." The jury here could reasonably conclude that Gomes " 'in some sort associate[d] himself with the venture, that he participate[d] in it as something that he wish[ed] to bring about, that he [sought] by his actions to make it succeed.' " United States v. Francomano, 554 F.2d at 486 (quoting Nye & Nissen v. United States, 336 U.S. 613, 619, 69 S.Ct. 766, 770, 93 L.Ed. 919 (1949)).

This is not a case of ambiguous and perhaps innocent "mere presence." Gomes's long-term habitation of the apartment at the invitation of a drug merchant; his acquaintance with the other drug merchants; the known presence of a merchantable quantity of prepackaged drugs stashed in the same place he kept his clothes, all permit an inference of conscious complicity going beyond "mere presence."

The cases cited by Gomes do not even suggest a contrary result. In United States v. Francomano, 554 F.2d 483, the defendants were present on a boat from which illegal drugs were seized but none of them were shown to have had knowledge nor reason to know of the presence of drugs on board. Moreover, they had a very plausible, innocent explanation for being on board. Gomes presents a different case because of his knowledge and control of the costly hashish, and the utter implausibility of his being put in such a position by the others unless he was regarded as a co-venturer. See also United States v. Mehtala, 578 F.2d 6 (1st Cir.1978).

In United States v. Mora, 598 F.2d 682 (1st Cir.1979), we reversed the defendant's conviction of conspiracy to import a controlled substance. Mora's travelling companion, Munoz, was caught with cocaine in false-bottom shoes. However,

[t]here [was] no evidence of any relationship between appellant and Munoz other than that they briefly travelled together in Colombia. There [was] no evidence that he helped her get to Colombia, that he helped her get the cocaine or knew she had it, that he helped her get false-bottomed shoes or knew she had them, or that he was in any way linked to her criminal venture.

Id. at 683. Again, Gomes's knowing possession is a distinguishing feature.

United States v. Cincotta, 689 F.2d 238 (1st Cir.), cert. denied, —— U.S. ——, 103 S.Ct. 347, 74 L.Ed.2d 387 (1982), provides a more fruitful analogy. In that case we upheld appellant's conviction for conspiring to defraud the United States. The conspiracy involved an oil company, Mystic Fuel Corp., which fraudulently charged the government for fuel oil that was never de-

livered. We upheld the conviction despite the lack of direct evidence connecting the defendant to the conspiracy, because "there was sufficient evidence of Cincotta's pervasive involvement in Mystic's operations ... for a reasonable juror to infer that Cincotta knew of, profited from, and encouraged the conspiracy ...." *Id.* at 241. In the present case there is no direct evidence of Gomes's involvement in the distribution scheme, but "[p]articipation in a criminal conspiracy need not be proved by direct evidence, a common purpose and plan may be inferred from a 'development and a collocation of circumstances.'" *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Gomes's association with the other conspirators coupled with his knowing dominion over the packaged and merchantable illegal drugs (a relationship the others would have scarcely allowed had he been a mere outsider) presents sufficient circumstances to support a verdict of guilt beyond a reasonable doubt.

I would therefore affirm the conviction of Gomes.