**Komson I. SPENCER, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–9024.

Court of Appeals of Alaska.

June 29, 2007.

David D. Reineke, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant.

Terisia K. Chleborad, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and David W. Márquez, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

STEWART, Judge.

Komson I. Spencer and a cohort, David Williams, restrained and assaulted Nathaniel Ahsoak over a period of several hours. For this conduct, Spencer was convicted of kidnapping and first-degree assault[1] and was

---

1. AS 11.41.300(a)(1)(C) and AS 11.41.200(a)(1), respectively.

sentenced to a composite term of 10 years' imprisonment. Spencer now appeals these convictions. For the reasons explained here, we conclude that Spencer's claims of error have no merit, and we therefore affirm the judgment of the superior court.

### Background facts and proceedings

On the morning of March 13, 2004, Ahsoak went to visit Spencer and Williams at their trailer in North Pole. They were acquaintances, and they regularly socialized.

The three men started drinking beer, and after four or five hours they went to a barbecue where they continued drinking. At about 8:00 p.m., they returned to Spencer's and Williams's trailer, and they continued to drink. Spencer's girlfriend, Sasha Dennis, was with them. Their friend Keifer Hering was also there, asleep on a couch.

At about 9:30 p.m., Ahsoak called a friend, Nicole James, to give him a ride home. Before James arrived, Ahsoak accidentally pushed Dennis and she fell down. Williams hit Ahsoak for pushing Dennis.

When James arrived, Spencer met her at the door. Spencer opened the door just three inches, and he told James that she could not come in to the trailer—and that Ahsoak was not leaving. Through the opening, James saw Ahsoak try to walk to the door, but Spencer would not let him out.

James returned to her car. When she looked back toward the trailer, through a window, she saw Williams hit Ahsoak in the stomach, causing Ahsoak to "fl[y] back." She watched for a few more minutes and then left.

Back inside the trailer, Spencer shaved Ahsoak's head while Williams held him down. Ahsoak at first testified that he did not consent to having his head shaved but later testified that he agreed to have his head shaved as punishment for pushing Dennis. Once Ahsoak's head was shaved, Spencer glued a pornographic picture to Ahsoak's head with super glue.

An hour or two later, Ahsoak and Williams fought. Ahsoak tried to leave, but Williams would not let him. Spencer decided that Ahsoak was winning the fight with Williams—that Williams was "getting [his] ass beat too bad"—so Spencer and Williams decided to tie Ahsoak up.

Spencer kicked Ahsoak's legs out from under him while Williams pulled Ahsoak to the floor. Ahsoak tried to get up, but Spencer and Williams pushed him back down. They then bound his wrists and legs with tape.

Over the next several hours, while Ahsoak lay bound, Spencer and Williams assaulted him. Spencer and Williams repeatedly hit Ahsoak's face and ribs with their closed fists. Ahsoak testified that Williams was doing most of the punching, while Spencer was "sitting there and enjoying it," but Ahsoak also testified that Spencer punched him a couple times. As Ahsoak described it, "one would hit me and go sit down and have a beer, and the other one would get up and hit me." Ahsoak testified that Williams also kicked him, but he was unsure whether Spencer ever kicked him. In addition, during these hours of assault, Williams twisted Ahsoak's ankle until it broke and jabbed Ahsoak with the handle of an axe.

Ahsoak managed to free himself from the tape, but Spencer and Williams "hog tied" Ahsoak, using plastic zip ties on his wrists to bind his hands behind his back and connect them to his ankles, which were bound with tape. Ahsoak could not see who was attacking him after he was hogtied, but he testified that Spencer and Williams talked to him every time they hit him. Ahsoak stated that he knew when Spencer had hit him because Spencer would announce that he was going to hit Ahsoak, and then Ahsoak was punched.

After midnight, two of Spencer's friends arrived. Ahsoak asked them for help, but Spencer told his friends to leave Ahsoak alone.

Eventually everyone in the trailer fell asleep. Around 9:30 or 10:00 the next morning, Keifer Hering (the friend who had been asleep on the couch) cut the zip ties off Ahsoak. The men all had a couple of beers, and then Spencer gave Ahsoak a ride home.

Ahsoak called the police and went to the hospital. The emergency room staff treated him for injuries to his face, chest, and ankle.

He had a broken ankle, a punctured lung, and broken ribs.

Spencer and Williams were tried for kidnapping and first-degree assault (under the theory that they recklessly caused serious physical injury to Ahsoak by means of a dangerous instrument).[2] The jury convicted both men of kidnapping and first-degree assault. Spencer received the mandatory minimum sentence of 5 years for the kidnapping, and a concurrent sentence of 10 years to serve for the assault—*i.e.*, a composite 10 years to serve.

*Discussion*

*Spencer's motion to strike Ahsoak's initial testimony*

■ After Ahsoak took the stand at Spencer's trial, and during a recess when the jury was absent, the prosecutor told Superior Court Judge Charles R. Pengilly that he had noticed "a hint of alcohol" on Ahsoak's breath. Judge Pengilly brought Ahsoak back to the stand and asked him if he had been drinking. Ahsoak admitted that he had consumed about four beers before he came to court, to relieve the stress he felt about testifying. Judge Pengilly asked Ahsoak if the alcohol was affecting his ability to testify, and Ahsoak said that it was.

At this point, Spencer's attorney moved to strike all of the testimony that Ahsoak had given thus far, on the ground that it was "incompetent testimony." Judge Pengilly responded that he believed Ahsoak was competent: "[M]y impression of it is that he's been perfectly coherent and cogent. I mean, he's not visibly intoxicated, otherwise, obviously, I would have said something earlier."

Notwithstanding Judge Pengilly's response, Spencer's attorney renewed his contention that Ahsoak was incompetent to be a witness, and he again asked Judge Pengilly to strike the testimony that Ahsoak had given so far. Judge Pengilly denied this request. However, the judge delayed the remainder of Ahsoak's testimony until the next morning, when he expected that Ahsoak would be sober. Judge Pengilly informed Spencer's attorney that, when Ahsoak returned to complete his testimony, the defense attorney would be allowed to cross-examine Ahsoak about his earlier intoxication. Judge Pengilly then told the jury that the trial was being recessed because of Ahsoak's intoxication.

When Ahsoak resumed his testimony the next day, Spencer's attorney cross-examined him about his intoxication. Ahsoak admitted that he had been drinking before he came to court the previous morning, because he had been nervous about testifying. Ahsoak also testified that he has a difficult time telling the truth "half the time" when he is intoxicated, because "I don't even remember what I'm saying half the time when I'm intoxicated." And Ahsoak admitted that he had been intoxicated when he testified the day before.

Now, on appeal, Spencer renews his argument that because of Ahsoak's intoxication, he was not a competent witness during his first day of testimony. Spencer relies on Alaska Evidence Rule 601. This rule provides:

A person is competent to be a witness unless the court finds that (1) the proposed witness is incapable of communicating concerning the matter so as to be understood by the court and jury either directly or through interpretation by one who can understand the proposed witness, or (2) the proposed witness is incapable of understanding the duty of a witness to tell the truth.

Spencer urges us to hold that an intoxicated witness is *per se* incompetent. However, in *Blume v. State*,[3] this court rejected a categorical attack on the competency of all young children to testify.[4] The court ruled that under Evidence Rule 601, a trial court "is vested with broad discretion on the issue of competency, and its decision to allow a witness to testify is subject to reversal only for abuse of discretion."[5] We directed trial courts "to evaluate the competency of each

---

**2.** *See* AS 11.41.200(a)(1).

**3.** 797 P.2d 664 (Alaska App. 1990).

**4.** *Id.* at 668.

**5.** *Id.*

prospective witness on a case-by-case basis, relying on the totality of the circumstances." [6]

There is nothing in the record to indicate that Ahsoak's initial testimony was incoherent. In fact, Judge Pengilly found just the opposite, and the record supports this finding. Nor is there any indication that Ahsoak was incapable of understanding his duty to tell the truth.

Spencer cites two cases to support his argument that Ahsoak's testimony should have been stricken: *Hartford v. Palmer*, 16 Johns. 143 (N.Y.Sup.Ct.1819) and *United States v. Hyson*, 721 F.2d 856 (1st Cir.1983). But neither of these cases requires a categorical exclusion of witnesses who have been drinking. Instead, both cases recognize that a witness's competence presents a question for the trial court's discretion, leaving the weight to be accorded to the testimony up to the jury. This approach is in accord with the approach in other jurisdictions. [7]

There is no categorical rule barring the testimony of a witness who has been drinking, and we reject Spencer's suggestion that we should adopt such a rule. Instead, trial judges should handle these situations as the circumstances require.

Here, Judge Pengilly recessed Ahsoak's testimony and directed Ahsoak to return to court sober the next day. The judge informed the jury about the problem and allowed Spencer's attorney to cross-examine Ahsoak regarding his previous intoxication, so that the defense attorney could suggest to the jury how Ahsoak's intoxication might affect the credibility of his earlier testimony. We find that Judge Pengilly properly exercised his discretion in this matter.

*Sufficiency of the evidence to support Spencer's convictions*

■ Spencer also contends that the evidence presented at his trial is legally insufficient to support his convictions. Because Spencer did not move for a judgment of acquittal in the superior court, he must show plain error.[8] The question is whether fair-minded jurors, exercising reasonable judgment, could conclude that the State had proven the charges beyond a reasonable doubt.[9] In making this assessment, we view the evidence (and the reasonable inferences from that evidence) in the light most favorable to the jury's verdicts.[10]

Turning to the charge of first-degree assault, the question is whether the evidence supports the conclusion that Spencer, either personally or through the actions of his accomplice, Williams, recklessly caused serious physical injury to Ahsoak by means of a dangerous instrument.[11]

■ Viewing the evidence in the light most favorable to the jury's verdict, Ahsoak suffered "serious physical injury"[12] as a re-

6. *Id.*

7. *See Diamond v. State*, 49 Ala.App. 68, 268 So.2d 850, 852 (Ala.Crim.App.1972) ("The admission of testimony of an allegedly intoxicated witness was not error since the weight to be accorded to the testimony is for the jury to say."); *Cannady v. Lynch*, 27 Minn. 435, 8 N.W. 164, 164–65 (1881) (holding that an intoxicated witness's competency is to be determined by the trial court); *State v. Underwood*, 28 N.C. 96 (N.C. 1845) (holding the competency of a drunk witness to be within the discretion of the trial court); *Prudential Ins. Co. of America v. Hashman*, 7 Ohio App.3d 55, 454 N.E.2d 149, 153 (1982) ("[W]hether a witness is so intoxicated so as to render him incompetent to testify is within the sound discretion of the trial court."); *Gould v. Crawford*, 2 Pa. 89 (Pa.1845) (holding that whether an intoxicated witness is competent is in the discretion of the court); *Myers v. State*, 37 Tex.Crim. 208, 39 S.W. 111, 112 (Tex.Crim.App. 1897) (holding that a witness's intoxication when

testifying does not render him incompetent, but goes to his credibility).

8. *See Shafer v. State*, 456 P.2d 466, 467–68 (Alaska 1969).

9. *Dorman v. State*, 622 P.2d 448, 453 (Alaska 1981); *Pease v. State*, 54 P.3d 316, 331 (Alaska App.2002).

10. *Dorman*, 622 P.2d at 453.

11. *See* AS 11.41.200(a)(1).

12. "Serious physical injury" is defined in AS 11.81.900(b)(56) as "physical injury caused by an act performed under circumstances that create a substantial risk of death" or "physical injury that causes serious and protracted disfigurement, protracted impairment of health, protracted loss or impairment of the function of a body member or organ, or that unlawfully terminates a pregnancy."

sult of the beating administered by Spencer and Williams. Ahsoak was treated at the hospital for a broken ankle, broken ribs, and a punctured lung.

As to the question of whether Spencer was criminally responsible for that beating, the evidence showed that Spencer actively assisted in restraining Ahsoak and that Spencer participated in the beating, by hitting Ahsoak several times with his closed fist both before and after Ahsoak was tied up.

Spencer notes that, even viewing the evidence in the light most favorable to the State, Spencer's co-defendant Williams was the one who inflicted most of the punches on Ahsoak, and Williams was the one who used the axe handle to strike Ahsoak. Based on this, Spencer argues that Williams was the one primarily responsible for Ahsoak's injuries.

But the State relied on a theory of accomplice liability. Under AS 11.16.110(2), a defendant becomes legally accountable for the conduct of another person if the defendant solicits, encourages, or aids the other person's criminal conduct "with intent to promote or facilitate the commission of the offense." If the State proved that Spencer was Williams's accomplice in the beating (thus rendering Spencer legally accountable for Williams's actions), then it did not matter whether Spencer personally inflicted Ahsoak's injuries.

Viewing the evidence in the light most favorable to the verdict, the jury could reasonably conclude that Spencer not only actively participated in the assault, but he also intentionally helped and encouraged Williams to participate in the assault, and that he acted with at least reckless disregard as to whether this assault would inflict serious physical injury on Ahsoak. The evidence is therefore legally sufficient to support Spencer's conviction for first-degree assault.

■ Spencer also argues that the State did not prove that he acted with the culpable mental state required to convict him as an accomplice. Relying on this Court's holding in *Echols v. State*,[13] Spencer contends that the State was obliged to prove that he "specifically intend[ed] that [Ahsoak] suffer serious physical injury." But in *Riley v. State*,[14] we expressly overruled our decision in *Echols*.[15] *Riley* holds that, when the charged crime requires proof of a particular result (here, the infliction of serious physical injury), the accomplice need not act "intentionally" with respect to this result.[16] Rather, the State must prove that the accomplice acted with the culpable mental state specified by the applicable criminal statute[17]—here, the culpable mental state of "recklessly" specified in subsection (a)(1) of the first-degree assault statute.

And, as we stated earlier, the evidence was sufficient to support a finding that Spencer acted with at least reckless disregard for the possibility that Ahsoak would suffer serious physical injury as a result of the beating administered by Spencer and his accomplice, Williams.

■ Turning to the charge of kidnapping, the question is whether the evidence supports the conclusion that Spencer, either personally or through the actions of his accomplice, Williams, restrained Ahsoak with the intent to inflict physical injury on him.[18]

Spencer does not dispute that he helped to restrain Ahsoak, but he argues that there is no evidence that, when he helped to restrain Ahsoak, he acted with the intention that Ahsoak be injured. This argument hinges on viewing the evidence in the light most favorable to Spencer. But as we explained above, we must view the evidence in the light most favorable to the verdict. Viewing the evidence in this light, there is ample evidence to support a finding that Spencer intended that Ahsoak suffer physical injury, either through Spencer's personal actions or through the actions of his accomplice, Williams.

**13.** 818 P.2d 691, 692–94 (Alaska App.1991).

**14.** 60 P.3d 204 (Alaska App.2002).

**15.** *Id.* at 221.

**16.** *Id.* at 221.

**17.** *Id.*

**18.** *See* AS 11.41.300(a)(1)(C).

*The jury instruction on accomplice liability*

When Judge Pengilly instructed the jury on accomplice liability, he used an instruction similar to the definitions of accomplice liability provided by the Alaska Supreme Court in *Evans v. State*[19] and *Gordon v. State.*[20] The jury instruction stated that a person who "knowingly" and with "criminal intent" assists or participates in a criminal act can be held accountable as an accomplice. The instruction further provided:

A person who in some manner, "knowingly" and with criminal "intent," assists or participates in a criminal act is an accomplice. An accomplice is legally responsible for the criminal act.

A person need not commit every element of the offense in order to be guilty as an accomplice. However, it is necessary that the person be in some way associated with the venture, that the person participate in it as something that he or she wishes to bring about, and that the person seek by his or her actions to make it succeed. Prior knowledge that a crime is about to be committed and concealment of that knowledge alone do not make one criminally liable as an accomplice. Furthermore, once a crime has been committed, concealment of one's knowledge of the crime does not make one an accomplice. Finally, mere presence at the scene of the crime is not in itself enough to make one an accomplice.

Spencer's attorney did not object to this instruction at the time. However, on appeal, Spencer argues that this instruction constituted plain error.

In particular, Spencer argues that the instruction is flawed because it did not require the jury to find that Spencer "specifically intended that [the] precise crimes [of kidnapping and first-degree assault] be accomplished." The answer to this contention is that the law does not require this proof.

Rather, as we explained in *Riley*, the State's complicity theory required proof (1) that Spencer encouraged or assisted Williams's restraint of, and assault on, Ahsoak; (2) that Spencer provided this encouragement or assistance to Williams with the intent to promote or facilitate the restraint and the assault; and (3) that when Spencer provided this encouragement or assistance, he also acted with the culpable mental states specified in the kidnapping and first-degree assault statutes—namely, intent to inflict physical injury on Ahsoak and reckless disregard of the possibility that Ahsoak would suffer serious physical injury.

The challenged jury instruction on complicity informed the jurors that the State was obliged to prove that Spencer participated in the restraint and the assault "as something that he ... wishe[d] to bring about," and that Spencer "[sought] by his [ ] actions to make it succeed." This was an adequate restatement of elements (1) and (2) listed in the preceding paragraph.

The challenged jury instruction did not mention element (3)—the requirement that the State prove that Spencer also acted with the culpable mental states specified in the underlying kidnapping and first-degree assault statutes (intent to inflict physical injury and recklessness regarding the possibility of serious physical injury). But other jury instructions, specifically the instructions that described the elements of kidnapping and first-degree assault, informed the jurors of this aspect of the State's required proof.

Accordingly, we conclude that it was not plain error for Judge Pengilly to give the challenged complicity instruction.

*Conclusion*

The judgment of the superior court is AFFIRMED.

MANNHEIMER, Judge, concurring.

I write separately to address two legal issues: the question of whether an intoxicated witness is competent to testify, and the question of how juries should be instructed concerning the law of complicity.

**19.** 550 P.2d 830, 841 (Alaska 1976).

**20.** 533 P.2d 25, 29 (Alaska 1975).

### The competency of an intoxicated witness under Alaska Evidence Rule 601

As explained in the majority opinion, Ahsoak was intoxicated when he first took the stand at Spencer's trial. Ahsoak nevertheless gave a significant amount of testimony before the prosecutor noticed that Ahsoak's breath smelled of alcoholic beverages. When the prosecutor brought this issue to Judge Pengilly's attention, and when Judge Pengilly then questioned Ahsoak about this matter, Ahsoak admitted that he had drunk several beers, that he was feeling the influence of the alcohol, and that it was affecting his testimony.

Spencer argues that, under these facts, Ahsoak was not competent to be a witness, and that Judge Pengilly should have struck all of Ahsoak's testimony up to that point.

Spencer relies most heavily on Ahsoak's statements that, "half the time", he has difficulty telling the truth when he is intoxicated, and that "[he doesn't] even remember what [he is] saying half the time when [he is] intoxicated." Spencer argues that Ahsoak could not be a competent witness if, because of intoxication, he was saying things with only half a regard to whether they were true.

This may, indeed, have been a valid reason to distrust Ahsoak's testimony, but it does not appear to be a ground for declaring that Ahsoak lacked the competency to testify.

Although the rules of evidence place many restrictions on the statements and the physical evidence that can be presented in court, the evidence rules place very few restrictions on the people who can appear as witnesses. The law has, at one time or another, prohibited whole classes of people (*e.g.*, felons, non-Christians and various Christian heretics, and all criminal defendants) from taking the witness stand; but under modern law, very few people are disqualified from testifying.[1]

In particular, under Alaska Evidence Rule 601, any person who is capable of understanding the duty to tell the truth and capable of giving coherent testimony is competent to be a witness. Evidence Rule 601 reads:

A person is competent to be a witness unless the court finds that (1) the proposed witness is incapable of communicating concerning the matter so as to be understood by the court and jury either directly or through interpretation by one who can understand the proposed witness, or (2) the proposed witness is incapable of understanding the duty of a witness to tell the truth.

Certainly, there are witnesses who have difficulty confining their testimony to the truth—because of self-interest, or bias for or against a party, or intoxication, or mental condition or disability, or otherwise. But this is not a ground for declaring the witness incompetent to testify under Evidence Rule 601. Rather, as Rule 601 states, a witness's competency hinges on whether the witness can sufficiently communicate the substance of their testimony "so as to be understood by the court and [the] jury", and whether the witness is capable of understanding "the *duty* . . . to tell the truth".

If a witness is so impaired by intoxicants or mental illness that their testimony is incoherent, then Evidence Rule 601 might serve as authority for declaring the witness incompetent to testify. See *United States v. Hyson*, 721 F.2d 856 (1st Cir.1983), where the First Circuit held that Federal Evidence Rule 601 justified the exclusion of testimony on competency grounds when the witness was incoherent due to drug use.

But Ahsoak's testimony was not incoherent. In fact, Judge Pengilly found just the opposite. When the matter of Ahsoak's drinking was brought to the judge's attention, Judge Pengilly declared, "My impression . . . is that [Ahsoak's testimony has] been perfectly coherent and cogent. . . . He's not visibly intoxicated; otherwise, obviously, I would have said something earlier."

Under these facts, Evidence Rule 601 does not appear to be a proper ground for excluding or striking Ahsoak's testimony. As the Sixth Circuit observed in *United States v. Ramírez*, 871 F.2d 582, 584 (6th Cir.1989) (construing Federal Evidence Rule 601), a court's power to exclude testimony out of

---

1. *See* Edward W. Cleary, *McCormick on Evidence* (2nd ed.1972), §§ 61–65, pp. 139–144.

concern that the witness is impaired must be found outside of Evidence Rule 601.

See *United States v. Van Meerbeke*, 548 F.2d 415 (2nd Cir.1976), a case in which the principle government witness ingested some of the heroin that had been offered into evidence. The Second Circuit held that the trial judge committed no error when he allowed the jury to decide whether the witness's testimony was credible, after giving the defense attorney the opportunity to bring out the fact that the witness had ingested drugs while on the stand.

See also *United States v. Harris*, 542 F.2d 1283 (7th Cir.1976), a case in which a government witness admitted using heroin two days before his testimony and taking Demerol and Phenergon on the day before his testimony. On several occasions during his testimony, the witness was observed to be bouncing and nodding. A defense expert testified that a person who had taken the same drugs that the witness had taken would experience a clouding of their consciousness and would have difficulty in accurately framing their thoughts. Nevertheless, the Seventh Circuit held that it was up to the jury to decide how the witness's drug usage and impaired condition affected the credibility of the witness's testimony.

This is not to say that a trial judge lacks the power to take precautionary or corrective measures when the judge learns that a witness is currently impaired by intoxicants. However, in all but the most extreme cases, the witness remains competent to testify under Evidence Rule 601.

*The jury instruction on accomplice liability*

This appeal presents one more instance of a problem that arises from time to time when the prosecution's case rests on the theory of accomplice liability.

The State argued that Spencer should be held accountable, as an accomplice, for conduct that was performed by his co-defendant Williams. Jury Instruction 20 told the jurors that an "accomplice" is "[a] person who[,] in some manner, knowingly and with criminal

intent, assists or participates in a criminal act". The instruction went on to say:

> A person need not commit every element of the offense in order to be guilty as an accomplice. However, it is necessary that the person be in some way associated with the venture, that the person participate in it as something that he or she wishes to bring about, and that the person seek by his or her actions to make it succeed.

At trial, Spencer did not object to the wording of this instruction. But now, on appeal, he contends that the trial judge committed plain error by giving this instruction.

Spencer's precise argument is that this instruction led the jury astray because it did not say that the State was required to prove that Spencer acted with "specific ... intent to bring about the illegal end". This contention is easily disposed of—for the instruction *did* tell the jury that this was a required element of the State's proof. The instruction said that, to establish a defendant's complicity in a criminal venture, "it is necessary that the [defendant] participate in [the venture] as something that he or she wishes to bring about [and have it] succeed."

To the extent Spencer is arguing that the government must prove that an accomplice acted "intentionally" with respect to any unlawful result that constitutes an element of the crime, even when the principal could be convicted on proof of a lesser culpable mental state (*e.g.*, knowledge or recklessness), Spencer is wrong. *See Riley v. State*, 60 P.3d 204, 221 (Alaska App.2002).

Nevertheless, Spencer's case does illustrate a recurring problem.

The jury instruction that was given in Spencer's case derives from Judge Learned Hand's formulation of the federal common-law definition of complicity in *United States v. Peoni*, 100 F.2d 401, 402 (2nd Cir.1938). More than thirty years ago, the Alaska Supreme Court adopted Judge Hand's formulation as an accurate statement of Alaska's common-law definition of complicity: see *Evans v. State*, 550 P.2d 830, 841 (Alaska 1976), quoting *Gordon v. State*, 533 P.2d 25, 29

(Alaska 1975), which in turn was quoting *Peoni.*

Since then, trial judges and attorneys have frequently turned to this language when it was necessary to instruct a jury on the law of complicity.[2] And, as Spencer's case illustrates, the *Peoni* formulation continues to appear in jury instructions to the present day.

The problem is that Alaska no longer relies on a common-law definition of complicity. Instead, we have a statute, AS 11.16.110(2), that specifies the elements that must be proved to establish accomplice liability.

(AS 11.16.110 actually specifies three different ways in which a person can be held criminally accountable for conduct performed by another person. We are concerned here only with subsection (2) of the statute—the portion that defines accomplice liability.)

AS 11.16.110(2) declares that a defendant "is legally accountable for the conduct of another [person] constituting an offense if [, acting] with [the] intent to promote or facilitate the commission of the offense, the [defendant] ... solicits the other [person] to commit the offense ... or aids or abets the other [person] in planning or committing the offense[.]"

In *Riley,* we construed this statute to require proof of both an unlawful act and a culpable mental state. The unlawful act can take one of three forms: (1) soliciting another person to engage in the conduct that constitutes the *actus reus* of the charged offense, (2) inciting or encouraging ("abetting") the other person to plan or engage in the conduct that constitutes the *actus reus* of the charged offense, or (3) aiding the other person in planning or committing that conduct.[3]

In addition to proving that the defendant solicited, encouraged, or aided the other person's conduct, the State must also prove that the defendant did so with the intent to promote or facilitate that conduct. *See Riley,* 60

P.3d at 207, 221. There is no accomplice liability if a defendant unwittingly encouraged or aided another person to commit a crime. Nor is there accomplice liability even when the defendant knew that their actions would assist another person in committing a crime, so long as the defendant remained indifferent to the success or failure of that crime. AS 11.16.110(2) requires the State to prove that it was the defendant's *intention* to promote or facilitate the other person's conduct. *Riley,* 60 P.3d at 210, 221.

If the State proves that the defendant engaged in one or more of the unlawful acts specified in AS 11.16.110(2) (soliciting, encouraging, or aiding another person's criminal conduct), and that the defendant did so with the culpable mental state specified in AS 11.16.110(2) (the intent to promote or facilitate the other person's criminal conduct), then the defendant is accountable for conduct that was performed by someone else.

But as we also explained in *Riley,* the State's proof of a defendant's complicity under AS 11.16.110(2) means only that the defendant can be held accountable for the *conduct* of another person.[4] Although AS 11.16.110(2) specifies the circumstances in which a defendant can be held vicariously liable for someone else's actions, the statute does not impose vicarious liability for someone else's culpable mental state. When the crime charged against the defendant requires proof, not only of conduct, but also of one or more culpable mental states, the State must prove that the defendant personally had the required culpable mental state(s).

In *Riley,* we gave the following example of how the culpable mental states of accomplices must be evaluated separately, even though all of the accomplices are jointly responsible for the criminal conduct:

Take, for instance, the situation [at common law] where two defendants are jointly accountable for a criminal homicide—one because he personally struck the fatal blow

**2.** *See, e.g., Hensel v. State,* 604 P.2d 222, 238 (Alaska 1979); *Carman v. State,* 602 P.2d 1255, 1260 (Alaska 1979); *Hansen v. State,* 845 P.2d 449, 456 (Alaska App.1993); *Bowell v. State,* 728 P.2d 1220, 1224 (Alaska App.1986); *Carman v. State,* 658 P.2d 131, 137 (Alaska App.1983).

**3.** *Riley,* 60 P.3d at 221.

**4.** 60 P.3d at 221.

or inflicted the fatal wound, and the other under a theory of complicity because he encouraged or assisted the homicidal act. If one of the defendants acted in cold blood (*i.e.*, with malice aforethought) while the other acted in the heat of passion, the one who acted with malice would be guilty of murder and the one who acted in the heat of passion would be guilty only of manslaughter. This was true regardless of which defendant was the perpetrator and which the accomplice.

*Riley,* 60 P.3d at 221.

To sum up this discussion: If the State proves the unlawful act and the culpable mental state specified in AS 11.16.110(2)— *i.e.*, the act of soliciting, encouraging, or aiding another person's unlawful act, coupled with an intent to promote or facilitate that unlawful act—then the defendant can be held accountable for conduct that was performed by another person. In such cases, when the jury considers whether the defendant committed the acts and/or caused the results that constitute the elements of the crime charged, the jury can take into account not only the conduct that was performed by the defendant personally, but also the conduct performed by any other person for which the defendant shares responsibility as an accomplice.

On the other hand, when the jury considers whether the defendant had the culpable mental state(s) required for the crime charged, the defendant's guilt (or the defendant's level of guilt, in cases where the degree of guilt hinges on the defendant's culpable mental state) depends on the defendant's personal mental state, not the mental states of the defendant's accomplices.

The *Peoni* formulation of complicity in large measure restates, and certainly does not contradict, the definition of complicity that is codified in AS 11.16.110(2). Rather, the problem with the *Peoni* formulation is that it fails to cover all of the details of the proof required by AS 11.16.110(2), and it is vague on the point that a defendant can be held accountable for another person's conduct, but not another person's mental state.

In past cases, these problems have not been fatal to any criminal convictions—either because, under the facts of the case, the failure to track the statutory language was inconsequential, or because the lawyers' summations to the jury cured any omissions or clarified any ambiguities in the *Peoni* instruction.

See, for instance, *Hansen v. State,* 845 P.2d 449 (Alaska App.1993), where the defendant acquiesced in a *Peoni* instruction at trial, but then challenged the instruction on appeal because the instruction failed to specify the culpable mental state codified in AS 11.16.110(2), "intent to promote or facilitate". We concluded that the *Peoni* instruction, coupled with other jury instructions dealing with accomplice liability, adequately conveyed this culpable mental state, and thus the deviation from the statutory language was not plain error. *Id.* at 459.

Nevertheless, when the issue of accomplice liability is raised, I encourage trial judges to inform juries of the requirements of AS 11.16.110(2). A *Peoni* instruction, in and of itself, is not error; but that instruction should be supplemented with another instruction that specifies the elements of our statutory definition of complicity.